T.C. Memo. 2015-63

UNITED STATES TAX COURT

SWF REAL ESTATE LLC, YELLOWFISH INVESTMENTS, INC. TAX
MATTERS PARTNER, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11190-11.                    Filed April 2, 2015.

<u>William L.S. Rowe</u> and <u>Timothy L. Jacobs</u>, for petitioner.

<u>Asif L. Raginwala</u> and <u>Paul T. Butler</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Respondent issued a notice of final partnership

administrative adjustment (FPAA) dated February 16, 2011, to Yellowfish

Investments, Inc. (petitioner), as tax matters partner of SWF Real Estate, LLC

(SWF), with respect to SWF's 2005 tax year.  The FPAA proposed an increase in

[*2] ordinary income and a corresponding decrease in capital contributions of $1,677,413, as well as a decrease in noncash charitable contributions of $4,921,233. On May 13, 2011, petitioner filed a timely petition pursuant to section 6226[1] for readjustment of respondent's determinations in the FPAA.

After concessions, the issues that we must decide are (1) whether SWF engaged in a disguised sale under section 707;[2] (2) if we decide that there was a disguised sale, whether the proceeds from the disguised sale were income to SWF during its 2005 tax year; and (3) whether SWF overstated the value of a conservation easement on Sherwood Farm and, therefore, the amount of the charitable contribution deduction allowed pursuant to section 170.[3]

## FINDINGS OF FACT

Some of the facts and certain exhibits have been stipulated. The parties' stipulated facts are incorporated in this opinion by reference and are found

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as amended (Code) and in effect for the relevant time, and Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[2]See infra notes 3 and 37.

[3]The remaining requirements set forth in sec. 170 and the regulations thereunder for claiming a charitable contribution deduction are not in dispute.

[*3] accordingly. Additionally, we take judicial notice of <u>Route 231, LLC v. Commissioner</u>, T.C. Memo. 2014-30 <u>appeal filed</u> (4th Cir. Sept. 16, 2014), for some facts relating to the general background of the State tax credits relevant to the instant case.[4]

At the time of filing the petition, SWF's and petitioner's principal place of business was in Virginia.

I.      Formation and Operation of SWF

SWF is a Virginia limited liability company that was formed on May 4, 2001. Petitioner, who is the tax matters partner of SWF, was incorporated in 2000 as a Delaware corporation and elected to be taxed as a subchapter S corporation effective September 30, 2000. At all times relevant to this case, John L. Lewis IV owned 100% of the shares of petitioner.

On May 21, 2001, petitioner purchased a 674.65-acre contiguous tract of land in Albemarle County, Virginia, known as "Sherwood Farm" for $3,450,000.

---

[4]A court may take judicial notice of appropriate adjudicative facts at any stage in a proceeding whether or not the the parties request it. <u>See</u> Fed. R. Evid. 201(a), (c); <u>see also</u> <u>United States v. Harris</u>, 331 F.2d 600, 601 (6th Cir. 1964) (explaining that a court may take judicial notice sua sponte). In general, a court may take notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b).

[*4] During 2001, petitioner contributed Sherwood Farm to SWF in exchange for 100% of the membership interests in SWF. From the time of that contribution during 2001 until December 2005, petitioner owned 100% of the membership interests in SWF and disregarded SWF as an entity separate from petitioner for Federal tax purposes.

During 2005 and 2006, SWF was starting its farming business and cattle breeding operation. SWF filed a Schedule F, Profit or Loss From Farming, for 2006, reporting $43,288 in gross income and $408,268 in expenses from its farming activity.

SWF owns all of the property at Sherwood Farm, including Mr. Lewis' residence, the businesses, the tractors, and the farm equipment. SWF reported $6,889,400 in assets on its 2005 tax return and $7,434,935 in assets on its 2006 tax return.

A.  Sherwood Farm

Sherwood Farm is in Albemarle County, Virginia, along the north side of Secretarys Road (SR 708) and the west side of Blenheim Road (SR 727),[5] an area

---

[5]The main access to Sherwood Farm is on Secretarys Road with secondary access from Blenheim Road, both of which are paved, and through two-lane secondary access roads through the area. Both Route 627 and SR 795, which connect to other major highways and to major employment, services, and shopping

(continued...)

[*5] 10 miles south of Charlottesville and Interstate 64. Sherwood Farm is in the southeast quadrant of Albemarle County[6] and in the Charlottesville metropolitan statistical area, which during 2005 was a desirable place for residential and commercial purposes.

Sherwood Farm had variable topography, ranging from open to gently rolling wooded land with negligible critical slopes. A small portion of Sherwood Farm lies within a 100-year flood zone along the banks of Murphy's Creek, but experts considered it to be generally excellent terrain for development purposes. Sherwood Farm is in the foothills of the Blue Ridge Mountains and offers views of forests, pastures, and mountains from various points on its property; some of the wooded land has little view amenity, but about two-thirds of the property is open with distant mountain views, rolling meadow views, and pond views.

---

[5](...continued)
found in Charlottesville, are easily accessible from Sherwood Farm. Sherwood Farm also has adequate road frontage for development purposes, with over 3,200 feet of frontage on Secretarys Road and over 1,200 feet on Blenheim Road.

[6]Albemarle County is divided into four quadrants, i.e., northwest, northeast, southeast, and southwest, by Interstate 64, which is the horizontal axis that runs west to east, and U.S. 29, which is the vertical axis that runs north to south.

[*6] Sherwood Farm had contained the following building improvements: an existing primary dwelling built in 1950 and renovated in 1979, a number of barns, sheds, an ice house, an old school, and two old tenant houses.

Sherwood Farm sits in the middle of a large block of protected lands;[7] it is surrounded by low-density uses and abuts property protected by a conservation easement held by the Virginia Outdoors Foundation. Sherwood Farm is located among other larger farm and estate parcels and smaller residential tracts in a low-density area known as "Carters Bridge".[8] Other estates in the Carters Bridge area include the Kluge Estate winery and vineyards, Albemarle House, Blenheim, Cedar Grove, Redlands, Lower Sherwood, Mill Cottage, Morven, Murcielago Farms, and Featheridge.

In addition to indirectly owning Sherwood Farm, Mr. Lewis owned a 65.9-acre property near Sherwood Farm.

---

[7]Nutmeg Farm, Plain Dealing Farm, and Lanark Farm are large farms in the immediate vicinity of Sherwood Farm that are protected by conservation easements.

[8]The southwest quadrant of Albemarle County is low density and agricultural with a number of very large estates; it is more comparable to Carters Bridge than the northeast quadrant. Keswick, which is in the northeast quadrant, is low density and a premier area of Albemarle County with large estates.

**[*7]** B.     Development Potential of Sherwood Farm

Sherwood Farm was in the "R-A Rural Areas" zoning district and therefore was eligible for rural subdivision, one of the three types of subdivisions permitted for "R-A Rural Areas". Rural subdivision allowed property to be divided such that each lot or parcel would (1) have a minimum of 250 feet of frontage on an existing public road and (2) contain at least five acres of land.[9] Moreover, pursuant to the "by right" division method,[10] the then-current zoning ordinance in Albemarle County[11] provided that each parcel of record could be divided into either development right lots, i.e., 5 or fewer lots between 2 acres and 21 acres in size per parcel, or excess lots, i.e., as many 21-plus acre lots as might be created.[12]

---

[9]All rural subdivisions were to be served by an internal subdivision street that satisfied Virginia Department of Transportation (VDOT) standards.

[10]There were two methods of subdivision for purposes of rural subdivision permitted under the Albemarle County zoning ordinance: "by right" division and "rural preservation development". Under the "by right" division method, landowners did not need to obtain special permission or request any exceptions to or waivers from the requirements of the Albemarle County zoning ordinance in order to undertake development. Under the "rural preservation development" method, landowners are required to file an application and seek special permission and approval from the Albemarle County Planning Commission.

[11]The then-current zoning ordinance in Albemarle County was adopted on December 10, 1980.

[12]Theoretically, a 38-acre parcel of record could be subdivided into five

(continued...)

[*8] On the basis of its location in the "R-A Rural Areas" zoning district and using the "by right" division method, Sherwood Farm had theoretical development rights for 42 lots and was suitable for low-density residential development. However, development rights allocated by the Albemarle County Code represented only the theoretical maximum number of lots that Sherwood Farm might be divided into; rights might not have been usable if the lot did not contain an appropriate building site that met other requirements of the zoning ordinance. In reality, the actual lots might not have been developed on account of topography or floodplains,[13] soil suitability for well and septic purposes, and required internal subdivision roads built to Virginia Department of Transportation standards. Moreover, although up to five single-family dwellings could have been established on each parcel of record, only one dwelling unit was permitted on each of the excess lots of 21-plus acres.

---

[12](...continued)
2-acre lots (10 acres) and one additional 21-plus-acre lot; an 84-acre parcel of record could be subdivided into five 2-acre lots (10 acres) and three additional 21-plus-acre lots; a 167-acre parcel of record could be subdivided into five 2-acre lots and seven additional 21-plus-acre lots; and a 220-acre parcel of record could be subdivided into five 2-acre lots (10 acres) and ten additional 21-plus-acre lots.

[13]A special exception was necessary to build on critical slopes, i.e., slopes greater than 25% or within 200 horizontal feet of any 100-year floodplain.

[*9]   During December 2005, Roger Ray prepared a rural subdivision analysis and development plan for Sherwood Farm, focusing on "by right" development as allowed by the Albemarle County zoning and subdivision ordinances.  Mr. Ray's subdivision analysis took into account a variety of factors, including (i) the size of Sherwood Farm, (ii) road access, (iii) topography, including the location of critical slopes and the 100-year floodplain, and (iv) Albemarle County's zoning and subdivision ordinances.  The parties agree that Mr. Ray is an expert in rural subdivisions who has done over 800 subdivision analyses in Albemarle County, Virginia.  On the basis of  his subdivision analysis and the proposed development plan, Mr. Ray concluded that 38 lots could be developed on Sherwood Farm and that development did not require any waivers or exceptions under the applicable Albemarle County zoning and subdivision ordinances.

C.    The 2005 Real Estate Market

During 2005, although population grew around the Charlottesville area at nearly double the rate found in other areas of Virginia, Albemarle County's population growth was partially restrained by zoning measures designed to limit growth in the R-A Rural Areas.  Combined with high demand, this circumstance caused property values in Albemarle County to increase rapidly.  During 2005, there was pressure to develop land; many larger farms were being developed into

[*10] subdivisions. During December 2005, Sherwood Farm was in a rising market; real estate prices in the area were high and were continuing to increase.

II.    Virginia Tax Credits

In the years leading up to 2005, the rural character of Albemarle County was in a state of decline due, in part, to the encroachment of significant development in its rural areas. Both the Federal Government and the Commonwealth of Virginia recognized the importance of land conservation and preservation by providing tax incentives, and Albemarle County adopted programs such as the Acquisition of Conservation Easements program to curtail development and to promote conservation of the County's rural areas.

During 1999, the Virginia General Assembly enacted the Virginia Land Preservation Tax Credit Program to allow qualifying landowners to receive tax credits for use on their State income tax returns. For the 2005 and 2006 tax years Virginia provided an income tax credit to encourage the preservation and sustainability of Virginia's unique natural resources, wildlife habitats, open spaces, and forested resources (Virginia tax credits). The Virginia tax credits were equal to 50% of the fair market value of any land or interest in Virginia that was donated to a public or private conservation agency eligible to hold the donated land and/or interests for conservation or preservation purposes. An interest in land

[*11] included a conservation easement if the easement complied with section 170(h); was conveyed for certain purposes such as agricultural, forestal, and open space purposes; and was an unconditional donation in perpetuity. Accordingly, a landowner who donated a qualified conservation easement could claim a credit in an amount equal to 50% of the fair market value of the conservation easement as long as the easement's fair market value was substantiated by a "qualified appraisal" prepared by a "qualified appraiser", as those terms are defined under the applicable provisions of the Code and the regulations.

Both individuals and corporations could use the Virginia tax credits on their State income tax returns. For a pass-through entity, such as a partnership, the Virginia tax credits could be used by the partnership or by the partners in proportion to their interest in the entity or as set forth in the partnership or other operating agreement. However, the Virginia tax credits could not be claimed by both the entity and the member, manager, partner, shareholder, or beneficiary for the same donation.

Any taxpayer issued Virginia tax credits for a tax year after 2002 was allowed to claim up to $100,000 of the credit for the taxable year in which the credit originated (i.e., the taxable year in which the qualified donation was made) and any of the five succeeding taxable years, for a total of $600,000 in credits over

[*12] the entire period. A taxpayer holding unused but otherwise allowable Virginia tax credits was able to sell or otherwise transfer the unused credits for use by another taxpayer on a Virginia income tax return. Any Virginia tax credits transferred were claimed as a credit on the transferee's tax return for the taxable year in which the transfer of the Virginia tax credits occurred. Over time, a market formed for the sale or transfer of Virginia tax credits.

The VDOT prescribed procedures for the 2005 and 2006 tax years with respect to the reporting of donations and the allocation or transfer of Virginia tax credits. The VDOT requested each donating landowner to register the Virginia tax credits and to verify a taxpayer's right to claim Virginia tax credits on his or her Virginia income tax return by submitting a completed Form LPC, Virginia Land Preservation Tax Credit Notification, as well as certain documentation, including a qualified appraisal of the donated property, the recorded easement, and a copy of a Form 8283, Noncash Charitable Contributions, executed by the donee. The Form LPC was filed to assist the VDOT with both the registration of the donation and the registration and recording of any subsequent transfers and allocations of the Virginia tax credits. While such submission was not prescribed by Virginia statute or regulation, the VDOT required procedurally that the Virginia taxpayer submit a Form LPC before he or she could use any allocated or transferred tax credits on a

[*13] Virginia income tax return. Likewise, while such a submission was not prescribed by Virginia statute or regulation, the VDOT directed donors and credit holders to submit the Form LPC and supporting documentation within 90 days of the origination or transfer of the Virginia tax credits or at least 60 days before filing the Virginia income tax return claiming the credits.

Once the VDOT received the Form LPC and supporting documentation, it would review the submitted documents for compliance with applicable rules and procedures. If the Form LPC was insufficient, the VDOT would ask the taxpayer to make the necessary corrections or supply the necessary documentation. On the other hand, if the VDOT determined that the Form LPC complied with requirements, the VDOT would provide a tax credit acknowledgment letter (credit acknowledgment letter). The credit acknowledgment letter included a unique credit transaction number known as an "LP number" and the effective year for the Virginia tax credits.[14] The credit acknowledgment letter stated: "A copy of this letter must be attached to your [Virginia income tax] return to claim the credit. You will need the assigned credit number if you wish to transfer this credit in the future." If a taxpayer wished to claim his or her Virginia tax credits on a Virginia

---

[14]The LP numbers allowed the VDOT to administratively track credits arising from specific conservation easement donations.

[*14] income tax return, the VDOT required that the taxpayer provide a copy of the credit acknowledgment letter.[15]

For purposes of determining the effective date of Virginia tax credits, VDOT distinguishes between an allocation and a transfer. In the case of an allocation of Virginia tax credits by a passthrough entity to its participants, the effective date for the allocation was deemed to be the date that the donation was recorded. In the case of a transfer of Virginia tax credits in a transaction involving parties that were not part of a passthrough entity, the effective date for the transfer was the date that the contract between those parties was executed.

During the 2006 legislative session Virginia made several changes to the statutory provisions applicable to the Virginia tax credit.[16] These changes applied only to conveyances of property made on or after January 1, 2007. On November 30, 2007, the Virginia tax commissioner released a summary of the changes in the

---

[15]If a taxpayer filed a Virginia tax return claiming Virginia tax credits without a credit acknowledgment letter, the VDOT would either contact the taxpayer, if it suspected that the taxpayer could rightfully claim the Virginia tax credits, or it would continue to process the return but disallow the Virginia tax credits.

[16]For the factual findings set forth in this paragraph, we take judicial notice of certain facts set forth in Route 231, LLC v. Commissioner, T.C. Memo. 2014-30, appeal filed (4th Cir. Sept. 16, 2014), regarding the legislative changes to and administrative interpretations of the Virginia tax credits.

[*15] form of a ruling. The ruling explained that the VDOT would "no longer simply acknowledg[e] the Credit as has been done in the past" but would have to "actually issue the Credit" for the Virginia tax credit to be valid.

III. Conservation Easement on Sherwood Farm

A. Donation of the Easement

After he moved to Charlottesville during July 2003, Mr. Lewis read about the conservation of land in Albemarle County in local magazines and advertisements. During 2005, Mr. Lewis contacted Melton McGuire of Conservation Solutions LLC (Conservation Solutions) to provide services and guidance with respect to a potential conservation easement on Sherwood Farm. In a letter dated July 5, 2005, Mr. McGuire, after retaining an appraiser to prepare a valuation of Sherwood Farm, suggested that an easement on Sherwood Farm would constitute a charitable gift of approximately $6.7 million and that it would also produce Virginia tax credits of approximately $3.2 million. Mr. McGuire advised Mr. Lewis that he had two options with respect to any Virginia tax credits that he was unable to use: to sell them or to allocate them using a partnership structure. Mr. McGuire also suggested that any unused Virginia tax credits could be transferred or allocated to George Brower at a rate of 53 cents per dollar of Virginia tax credits transferred or allocated. Mr. Brower was a principal of

[*16] Virginia Conservation Tax Credit Fund LLLP (Virginia Conservation), along with Daniel Gecker, and had worked with developers by providing capital in exchange for tax credits earned through the rehabilitation of historic properties. Virginia Conservation was a Virginia limited liability limited partnership with a business address in New Orleans, Louisiana; its business activities included the acquisition and syndication of Virginia tax credits.[17] Mr. Brower had previously partnered with Mr. McGuire for the donation of a conservation easement on Mr. McGuire's farm for which Mr. McGuire and Virginia Conservation had each received an allocation of Virginia tax credits.

During November 2005, after conversations with both Mr. McGuire and Mr. Brower, Mr. Lewis and petitioner decided to move forward with the conservation easement on Sherwood Farm and the transaction between SWF and Virginia Conservation involving the transfer of Virginia tax credits (VTC transaction). Mr. Lewis and petitioner engaged Mr. McGuire and Conservation Solutions to provide services to undertake the VTC transaction. Because the relevant parties had more experience with the partnership structure and Mr. Lewis was concerned about selling the Virginia tax credits on his own, Mr. Lewis and Mr. McGuire

---

[17]According to Tracey Shaw, Virginia Conservation's counsel, Virginia tax credits were the primary reason for Virginia Conservation's investments in partnerships that donate conservation easements.

[*17] decided to engage in the VTC transaction through a partnership structure in which Virginia Conservation would contribute funds of 53 cents per dollar of Virginia tax credits and receive a nonvoting minority interest in SWF and an allocation of Virginia tax credits. Previously, Mr. McGuire had stated that the partnership structure would ensure that the money paid by Virginia Conservation would not be taxable and that "the $0.53 per dollar that [it paid] * * * [was] the equivalent of selling the [Virginia tax credits] * * * for over $0.80 per dollar." Mr. Lewis's understanding of the transaction was that the amount of Virginia Conservation's capital contribution to SWF was directly based on the amount of Virginia tax credits to be transferred or allocated to Virginia Conservation. Before entering into the VTC transaction, neither Mr. Brower nor Tracey Shaw, Virginia Conservation's counsel, reviewed balance sheets, profit and loss statements, income statements, business plans, or valuations regarding SWF's businesses; in fact, none of these documents were provided by SWF to anyone representing or affiliated with Virginia Conservation.

Mr. McGuire engaged consultants and attorneys to assist in the VTC transaction, including James Skeen and Keven Patchett of the law firm of Skeen Law, to handle the registration of the Virginia tax credits with the VDOT and to

**[*18]** provide SWF and Mr. Lewis business and legal advice about the registration process.

On December 29, 2005, SWF executed a deed of conservation easement, conveying a conservation easement on Sherwood Farm (easement) to the Albemarle County Public Recreational Facilities Authority (Albemarle County PRFA), a governmental body of Albemarle County in Virginia. Before the donation of the easement, Sherwood Farm was not under any existing conservation easement. On December 30, 2005, the deed conveying the easement was recorded with the Clerk's Office of the Circuit Court for Albemarle County, Virginia.

B.    Terms of the Easement

Pursuant to the terms of the easement, the existing four parcels of Sherwood Farm were to be treated as a single parcel that was not to be divided or subdivided; the single parcel could be sold or conveyed only as a whole, single unit of 674.65 acres. The easement deed also provided that no more than five dwelling units be built on the site. Moreover, the construction, placement, or maintenance of certain structures or improvements on Sherwood Farm were not permitted unless the structures or improvements were on the property as of the date of the easement

[*19] and/or were authorized by the Albemarle County PRFA.[18] The easement deed also prohibited any industrial or commercial uses for Sherwood Farm, with the exception of certain agricultural, forestal, and other minor listed uses.[19]

The easement was perpetual, and its restrictions ran with the land and were binding upon the parties, successors, assigns, representatives, and heirs. Considering the market, the location, and the existing use of Sherwood Farm, the highest and best use of Sherwood Farm before the recording of the easement deed was for low-density residential development into estate type lots. However, after the easement deed was recorded, the highest and best use of Sherwood Farm shifted toward agricultural, limited forestal, or recreational use.

---

[18]Specifically, (1) modification of certain existing structures that increased the footprint of the structure by more than 5% required approval from the Albemarle County PRFA; (2) modification of the exterior facade, but not the interior, of the historic structures required approval from the Albemarle County PRFA, unless undertaken for emergency repairs; (3) certain construction of new structures in three building envelopes was allowed without any further consent from Albemarle Country PRFA; (4) the total footprint of all structures on the property was to be less than 60,000 square feet; and (5) SWF was permitted to install, replace, modify, or destroy wells, roads, and utility lines as required, but new roads were not to exceed a width of 12 feet.

[19]The easement deed also required SWF to establish riparian buffer areas within 100 feet from the bank of certain identified streams, including Murphy's Creek, and no new improvements were permitted within the buffer areas. Cattle and/or livestock were to be restricted from the buffer areas, except along existing pasture area, by fencing to be installed and maintained by SWF.

**[*20]** C.     Valuation of the Easement

In connection with the charitable easement, Conservation Solutions engaged Stephen G. Williams of Williams Appraisers, Inc., to prepare a qualified appraisal of the easement. Mr. Williams' appraisal was dated December 12, 2005, and had an effective date of December 2, 2005. Using a subdivision development analysis, Mr. Williams determined that the easement had a value of $7,398,333, which he derived from subtracting the after-easement value of $4,047,900 from the before-easement value of $11,446,233. Mr. Williams also concluded that the easement would result in $3,699,167 of Virginia tax credits that SWF could use or transfer.

IV.     SWF's Transaction With Virginia Conservation

During December 2005, Mr. Skeen and Mr. Patchett, on behalf of Conservation Solutions and SWF, began negotiating the VTC transaction documents with Mr. Shaw, who represented Virginia Conservation. The transaction documents included a partnership agreement for SWF (operating agreement), a subscription agreement, an option to purchase agreement (option agreement), and an escrow agreement.

A.     Operating Agreement

Before December 1, 2005, SWF operated without a written operating agreement because petitioner was the sole member of SWF. According to the

[*21] operating agreement for SWF dated December 1, 2005, Virginia Conservation became a member of SWF during December 2005; the parties agreed that Virginia Conservation effectively became a partner in SWF on December 1, 2005.

The operating agreement stated that SWF's purpose was the "long-term appreciation of * * * [Sherwood Farm] and, in addition, the charitable purpose to assist in the preservation of significant lands in Virginia" and that SWF, as of the effective date of the operating agreement, anticipated the recordation of deed of a conservation easement on Sherwood Farm that would qualify for Virginia tax credits. Through the various drafts of the operating agreement, SWF and Virginia Conservation made revisions to ensure that the transaction was not "mistakenly * * * characterized as a sale of tax credits" as that was "not the intention of the parties [to the VTC transaction]."

The operating agreement stated that petitioner's percentage interest in SWF was 99% and Virginia Conservation's percentage interest in SWF was 1%, but it did not create separate classes of membership interests. The operating agreement allocated partnership profits and losses to the members in proportion to their respective percentage interests in SWF; profits and losses included gain or loss resulting from any disposition of property owned by SWF, including real and

[*22] personal property, any improvements thereto, and both tangible and intangible property. Any net cashflow, which included gross cash proceeds from SWF's operations (including sales, dispositions, and refinancings of SWF's property) less reserves for SWF's expenses, debt payments, capital improvements, replacements, and contingencies, was also to be distributed to petitioner and Virginia Conservation in proportion to their respective percentage interests in SWF. Additionally, pursuant to section 3.6 of the operating agreement, Virginia tax credits of $300,000 and $3,050,000, were to be allocated to petitioner and to Virginia Conservation, respectively.

SWF and Mr. Lewis represented and warranted that the Virginia tax credits would be earned on or before December 31, 2005. SWF also agreed to represent and warrant that it had not used and would not use any portion of the Virginia tax credits allocated to Virginia Conservation to offset or satisfy its State income tax liability in any year and that it had not transferred and would not transfer the Virginia tax credits allocated to Virginia Conservation to any other taxpayer beyond the $300,000 of Virginia tax credits allocated to petitioner. Any additional Virginia tax credits arising from the donation of the easement were to be allocated among the members, or sold to persons other than members, as determined by the members holding at least 66% of the percentage interests in SWF.

**[*23]** The operating agreement named Mr. Lewis as the "Manager" of SWF and vested him with the day-to-day management responsibilities.[20] Since the execution of the Operating Agreement, SWF has treated itself as a partnership between petitioner and Virginia Conservation for Federal tax purposes.

### B. Subscription Agreement

The parties also executed a subscription agreement, dated "effective December 15, 2005", to add Virginia Conservation as a partner in SWF. The subscription agreement provided that Virginia Conservation offered to acquire from SWF, and SWF accepted Virginia Conservation's offer to acquire from SWF, a 1% percentage interest in SWF in exchange for a capital contribution of $1,616,500.[21] According to the subscription agreement, Virginia Conservation acquired the 1% percentage interest in SWF "for investment purposes only and not

---

[20]The original operating agreement incorrectly identified Mr. Lewis, and not petitioner, as the founding and continuing member of SWF. As we discuss below, petitioner and Virginia Conservation executed an amendment to the operating agreement to reflect the correct members of SWF.

[21]Attachment 3 of the operating agreement indicated that petitioner made an initial capital contribution of $12,485,733 and that Virginia Conservation made an initial capital contribution of $1,802,000. As we discuss in more detail below, Virginia Conservation's capital contribution increased from $1,616,500 to $1,802,000 as a result of additional Virginia tax credits that were allocated to Virginia Conservation because of the higher value for the easement than originally estimated.

**[*24]** for distribution or resale to others." The subscription agreement states that in addition to the rights to share in the profits, losses, and governance of SWF as set forth in the operating agreement, Virginia Conservation's alleged capital contribution entitled it to receive an allocation of Virginia tax credits of $3,050,000 from the easement on Sherwood Farm. Pursuant to the subscription agreement, Virginia Conservation was to transfer $1,616,500 to Mr. Skeen, who would be acting as an escrow agent pursuant to the terms of the escrow agreement.

Section six of the subscription agreement, entitled "Credit Indemnity", granted SWF the option to defend against claims asserted by the VDOT or the IRS against SWF or Virginia Conservation with respect to a disallowance or reduction of the Virginia tax credits. The subscription agreement provided that (1) if SWF elected to not defend against such a claim asserted by the VDOT or the IRS, (2) upon a final, nonappealable decision resulting in a disallowance of the Virginia tax credits, or (3) upon a reduction in the value of the Virginia tax credits, then SWF and Mr. Lewis were required to indemnify Virginia Conservation for the disallowed or reduced Virginia tax credits in an amount equal to the sum of (i) 53 cents for each dollar in value of Virginia tax credits that was disallowed or reduced, and (ii) any amounts due to the VDOT or the IRS in fines, interest, or

[*25] penalties and reasonable costs and expenses arising out of such disallowance or reduction.

The subscription agreement was executed by Mr. Lewis, as manager of SWF and Mr. Brower, as managing member of Virginia Conservation. Mr. Lewis also signed the subscription agreement on his own behalf to acknowledge his agreement to be personally bound by the credit indemnity provisions.

C.     Escrow Agreement

In addition to entering into the operating agreement and the subscription agreement, SWF and Virginia Conservation entered into an escrow agreement with Mr. Skeen during December 2005. The escrow agreement named Mr. Skeen as an escrow agent on behalf of Virginia Conservation and SWF for purposes of the VTC transaction.

Pursuant to the escrow agreement, if either (1) the easement deed was not recorded in the Clerk's Office of the Circuit Court of Albemarle County on or before December 31, 2005, or (2) Virginia Conservation was not admitted as a 1% partner in SWF on or before December 31, 2005, the funds deposited in the escrow account were to be returned to Virginia Conservation. Moreover, funds transferred by Virginia Conservation to Mr. Skeen for the alleged capital contribution to SWF were to be held in escrow and not released until all of the

[*26] following events had occurred: (1) SWF or Virginia Conservation had provided to Mr. Skeen: (i) the credit transaction number with respect to the Virginia tax credits issued by the VDOT; (ii) evidence of the recordation of the easement deed in the Clerk's Office of the Circuit Court of Albemarle County, Virginia; and (iii) a report of title issued by Chicago Title (together with relevant documents) with an effective date and time after the date and time of recordation of the easement deed, issued to Mr. Skeen and Virginia Conservation's counsel; and (2) Mr. Skeen had: (i) provided all of the items required above to Virginia Conservation's counsel; and (ii) received written instructions from Virginia Conservation's counsel confirming that the requirements above had been satisfied and authorizing the release of the escrowed funds to SWF.

The escrow agreement required the funds provided by Virginia Conservation to be held by Mr. Skeen, in trust, in his non-interest-bearing attorney trust account,[22] or, alternatively, to be held in an interest-bearing account or accounts in Mr. Skeen's name, provided that he was instructed in writing to do so

---

[22]An attorney trust account is held by an attorney in trust for clients or third parties and governed by professional and ethical rules.

**[\*27]** by Virginia Conservation. Mr. Skeen was not permitted to transfer or invest the escrowed funds without Mr. Shaw's written authorization.[23]

D.    Option Agreement

On December 27, 2005, Virginia Conservation and Mr. Lewis entered into the option agreement.[24] The option agreement granted Mr. Lewis an option to purchase all, but not less than all, of the membership interests of Virginia Conservation in SWF. Pursuant to the option agreement, the purchase price of the 1% percentage interest in SWF held by Virginia Conservation would be agreed upon by the parties or, if not agreed upon, then it would be 1% of the net fair market value of SWF's assets at exercise. The option under the option agreement became fully exercisable only by Mr. Lewis on or at any time after January 1, 2010,[25] but remains exercisable as of this proceeding. During the process of

---

[23]Until the escrowed funds were disbursed, Mr. Skeen was required to take all reasonable measures to ensure the protection of the escrowed funds; a failure to comply with the terms of the escrow agreement with respect to the release of the funds would have subjected Mr. Skeen to liability or discipline under the Virginia bar rules.

[24]Although Mr. Brower, as managing member of Virginia Conservation, signed the option agreement, Mr. Lewis did not sign it because it contained no covenants, warranties, or obligations on his part.

[25]Virginia Conservation and Mr. Lewis agreed to an exercisable date of January 1, 2010, in part because it was a compromise between a potential tax audit

(continued...)

[*28] negotiating the various documents that underlie the VTC transaction, Mr. McGuire referred to the option agreement as "the vehicle that gets * * * [Mr. Brower] out of the deal."

### E.  Completion of the VTC Transaction Documents

When the final appraisal was delivered on December 12, 2005, the valuation of the easement on Sherwood Farm was higher than expected and, consequently, the resulting Virginia tax credits were higher than anticipated.  The parties to the VTC transaction agreed that Virginia Conservation would receive the additional Virginia tax credits but that they would not be reflected in the transaction documents.  The parties agreed that Virginia Conservation would increase its payment from $1,616,500 to $1,802,000, at a rate of 53 cents per dollar of additional Virginia tax credits expected to be allocated to Virginia Conservation. Although the agreements were stated as effective and were dated at certain specified points during December 2005, Mr. Brower, on behalf of Virginia Conservation, and Mr. Lewis, on behalf of himself and petitioner, executed all of the relevant transaction documents by December 30, 2005.  The signature pages for the operating agreement, the subscription agreement, and the escrow

---

[25](...continued)
timetable of six years and a shorter timetable.

[*29] agreement were circulated among the parties during January 2006. The operating agreement established initial capital contributions by petitioner of $12,485,733, deemed made on May 4, 2001, and by Virginia Conservation of $1,802,000, deemed made on December 1, 2005.

F.     Transfer of Funds

On or before December 30, 2005, pursuant to the escrow agreement, Virginia Conservation deposited $1,802,000 (in two installments of $1,702,000 and $100,000) in Mr. Skeen's non-interest-bearing attorney trust account. The escrowed funds remained in Mr. Skeen's non-interest-bearing attorney trust account through the end of 2005 and into January 2006.[26]

On January 9, 2006, Mr. Patchett contacted Mr. Lewis to see whether he would like the escrowed funds moved into an interest-bearing escrow account. On January 10, 2006, Mr. Skeen sent an email to Mr. Shaw informing him that SWF had requested the escrowed funds be placed in an interest-bearing account in the name of Mr. Skeen, as escrow agent, and asking whether Virginia Conservation would allow the transfer. On January 18, 2006, Mr. Shaw sent an email to Mr.

---

[26]The funds did not earn interest while in the attorney trust account; any interest earnings mandatorily were paid to "IOLTA", the Virginia legal aid fund.

[*30] Skeen authorizing[27] Mr. Skeen to invest the escrowed funds in a money market or other no-risk investment and, when the escrow was released, for Mr. Skeen to release the interest earned on the account to SWF as part of Virginia Conservation's capital contribution. On January 25, 2006, Mr. Skeen opened an interest-bearing money market account under the name "James E. Skeen", as "Escrow Agent for SWF Real Estate, LLC" and provided the bank with SWF's taxpayer identification number for that account; sometime shortly thereafter, he deposited escrow funds of $1,802,000 from the non-interest-bearing attorney trust account into the interest-bearing money market account.

As required pursuant to the escrow agreement, the easement deed was recorded on December 30, 2005, and evidence of this recordation was provided to Virginia Conservation and Mr. Shaw shortly after the recordation. Mr. Patchett sent to Mr. Shaw on March 16, 2006, a title report, prepared and dated after the

---

[27]Initially, Mr. Shaw expressed concern that, if the escrowed funds were invested and the value declined, Virginia Conservation would be obligated to contribute the full $1,802,000 of escrowed funds; basically, that Virginia Conservation bore the risk of any decline in value due to investment in an interest-bearing account. When Mr. Shaw asked Mr. Gecker for his thoughts regarding the request to transfer the escrowed funds to an interest-bearing account, Mr. Gecker stated: "Although I should care, I really don't. We have what we bargained for -- it is unlikely that we will get the money back. Unless you disagree, let them invest and keep interest." SWF eventually agreed to assume the risk associated with any decline in value of the funds while they were held in an interest-bearing account.

[*31] easement.[28] On March 30, 2006, Virginia Conservation and SWF received the credit transaction number from the VDOT; as of that moment, each of the conditions set forth in the escrow agreement for release of the escrowed funds was satisfied.

However, before authorizing the release of the escrow as required by the escrow agreement, Mr. Shaw required the execution of the first amendment to the operating agreement (first amendment) to reflect petitioner, and not Mr. Lewis, as the other member in SWF. The original operating agreement mistakenly named Mr. Lewis, and not petitioner, as the founding and continuing member of SWF, but Mr. Lewis did not at any time directly hold a membership interest in SWF. On April 13, 2006, Mr. Lewis signed the first amendment, thus amending the operating agreement by naming petitioner as the founding and continuing member of SWF in place of Mr. Lewis and to confirm Mr. Lewis' role as manager. On April 14, 2006, Mr. Shaw authorized Mr. Skeen to release to SWF the escrowed

---

[28]SWF had previously received a title report from Chicago Title that stated that there were no encumbrances that might affect the value of the easement, but the title report was prepared and dated before the recording of the easement deed.

[*32] funds and to pay to SWF any interest and other earnings on the invested escrowed funds. In total, Virginia Conservation transferred $1,802,000 to SWF.[29]

After Mr. Skeen received the requisite authorization to release the escrowed funds, the remaining escrowed funds were paid to SWF for its own use or to other parties as directed by SWF. On April 17, 2006, Mr. Skeen paid the remaining $1,456,412[30] from the escrow account to a bank account owned by petitioner. Over the course of six transfers from April 24 to August 17, 2006, petitioner transferred from its bank account to SWF the following varying amounts of the escrowed funds:

| Date | Amount |
| --- | --- |
| Apr. 24, 2006 | $350,000 |
| May 30, 2006 | 200,000 |
| July 10, 2006 | 500,000 |
| July 25, 2006 | 20,000 |
| Aug. 1, 2006 | 50,000 |
| Aug. 17, 2006 | 320,000 |

---

[29]Although Virginia Conservation agreed to pay to SWF a $500 nominal initial contribution to enter into the VTC transaction, there is no evidence that the $500 nominal initial contribution was ever paid.

[30]Mr. Skeen paid consulting fees of $356,759 to Conservation Solutions for its services in furtherance of the easement and the VTC transaction.

[*33] In total, petitioner transferred to SWF $1,440,000 of the escrowed funds it received from Virginia Conservation.

V.    Application For and Use of Virginia Tax Credits

During the end of December 2005, Mr. Skeen and Skeen Law began preparing the Forms LPC for the VTC transaction.  On January 19, 2006, Mr. Patchett sent a Form 8283 regarding the donation of the easement by SWF to Scott Clark, the senior planner for the Albemarle County PRFA.  On February 13, 2006, the Albemarle County PRFA signed the Form 8283 and returned it to Skeen Law's office.

SWF's Form LPC was signed by Mr. Lewis and notarized on February 21, 2006.  On February 22, 2006, Mr. Patchett mailed SWF's Form LPC (LPC #1) to the VDOT; attached to LPC #1 was a copy of the full appraisal reporting that the value of the easement was $7,398,333, a copy of the recorded easement deed, and a signed Form 8283.  Section 6 of LPC #1 indicated that SWF was the current holder of Virginia tax credits and that $299,167 of the Virginia tax credits would be allocated to petitioner and $3,400,000 to Virginia Conservation.  On February 22, 2006, Mr. Patchett mailed a second Form LPC (LPC #2) relating to the transfer of $299,167 of Virginia tax credits from petitioner, who was listed as the current holder of Virginia tax credits, to Mr. Lewis.  LPC #2 was also signed by Mr.

**[*34]** Lewis and notarized on February 21, 2006. The $299,167 of Virginia tax credits allocated to petitioner were transferred or allocated to Mr. Lewis on or before December 31, 2005.

In a letter dated December 30, 2005, and addressed to Cathy Early of the VDOT, Mr. Gecker represented that Virginia Conservation acquired $3,400,000 in Virginia tax credits from SWF and subsequently transferred $2,720,000 of those Virginia tax credits to Chesterfield Conservancy, Inc. (Chesterfield Conservancy),[31] a nonprofit organization created by Mr. Gecker and other individuals. Chesterfield Conservancy was a limited partner in Virginia Conservation and intended to obtain Virginia tax credits for subsequent sale to individual taxpayers; the revenue from the sales would allow Chesterfield Conservancy to further its charitable conservation purposes. According to a search of State tax records by Ms. Early, 35 individual investors purchased from Chesterfield Conservancy Virginia tax credits of $2,420,000 that originated from

---

[31]Petitioner objects to the credibility of this letter and contends that there is no evidence that Mr. Gecker sent the letter to Ms. Early and that other information in the letter is inaccurate. However, Mr. Gecker signed the letter and identified the letter as his own at trial, and the letter was admitted as evidence. Although we do not opine on whether the letter was actually sent to Ms. Early or whether other information in the letter is accurate, we believe that the letter is probative as to Mr. Gecker's understanding of the allocations of Virginia tax credits from Virginia Conservation after the VTC transaction.

[*35] the easement on Sherwood Farm; 32 of those individual taxpayers claimed

Virginia tax credits originating with the easement in a total amount of $2,157,633

on their 2005 State income tax returns.[32]

The VDOT received LPC #1 on March 1, 2006.  The VDOT sent Virginia

Conservation a credit acknowledgment letter dated March 30, 2006, that

acknowledged receipt of LPC #1, listed the credit transaction number as LP

050135,[33] and provided that Virginia Conservation could receive Virginia tax

credits, effective tax year 2005 and expiring tax year 2010, of $3,400,000 for a

donation of the easement to the Albemarle PRFA.[34]  The credit acknowledgment

letter also stated that the letter itself did not constitute approval of the amount of

Virginia tax credits, that Virginia tax credits might be disallowed in whole or in

---

[32]Petitioner objects to the spreadsheets documenting Ms. Early's search, which were attached to alleged Forms LPC filed by Virginia Conservation and Chesterfield Conservancy, as hearsay.  Although we sustain petitioner's hearsay objection as to Forms LPC themselves because Ms. Early was not qualified to testify as to the truth of the matters asserted therein, we conclude that the hearsay restriction does not extend to spreadsheets that were created by Ms. Early and that document the results of searches she conducted.

[33]The first two digits in the LP number, "05", indicate VDOT's acknowledgment that the Virginia tax credits could be claimed during the 2005 tax year.

[34]The first year in which Mr. Lewis and Virginia Conservation could claim Virginia tax credits arising out of the easement was 2005, because that was the year in which the easement deed was recorded.

[*36] part upon subsequent review and audit by the VDOT, and that the VDOT made no warranties that any tax benefits would be available to the donor of the easement or to any transferee of the Virginia tax credits.

VI.    Tax Returns of the Participants

A.    Federal Income Tax Returns

SWF timely filed its Form 1065, U.S. Return of Partnership Income, including Schedules K-1, Partner's Share of Income, Deductions, Credits, and Other Items for its 2005 tax year.  On its tax year 2005 Form 1065, SWF reported a charitable contribution of $7,398,333 from the easement and indicated that it used a cash basis method of accounting.  On Schedule L, Balance Sheet per Books, of its 2005 Form 1065, SWF reported $1,802,000 on line 1 for "Cash" at "End of tax year".  On the Schedule M-2, Analysis of Partners' Capital Accounts, on its 2005 Form 1065, SWF reported $1,802,000 on the line for "Capital contributed" in "Cash".  On the 2005 Schedule K-1 for Virginia Conservation, Box N, Partner's Capital Account Analysis, reports $1,802,000 next to the line entitled "Capital contributed during the year".  The Schedule K-1 for Virginia Conservation represented that Virginia Conservation received a 1% interest in the income, losses, and capital of SWF for the 2005 tax year, and SWF allocated

[*37] $73,983 of the charitable deduction arising out of the easement to Virginia Conservation pursuant to its 1% percentage interest.

SWF also timely filed with the IRS, pursuant to extensions, its Form 1065 for its 2006 tax year.[35] On its Form 1065 for its 2006 tax year, SWF indicated that it had a beginning cash balance of $1,802,000 on January 1, 2006.

B.     Virginia Income Tax Returns

SWF also filed with the VDOT its 2005 and 2006 Forms 502, Virginia Passthrough Entity Return of Income, together with Schedules VK-1 (Form 502), Owner's Share of Income and Virginia Modifications and Credits, for each purported partner of SWF. On a Schedule VK-1 filed with its Form 502, SWF allocated $3,400,000 in Virginia tax credits to Virginia Conservation.

Mr. Lewis reported $299,166 in Virginia tax credits on Schedule CR, Credit Computation Schedule, line 100, of his 2005 Virginia Form 760CG, Resident Individual Income Tax Return, for his 2005 tax year. Mr. Lewis claimed $92,833 of the Virginia tax credits to offset taxes owed for his 2005 tax year, $100,000 of the Virginia tax credits to offset taxes owed for his 2006 tax year, $100,000 of the

---

[35]SWF's 2005 and 2006 Forms 1065 were prepared by Mr. Skeen and signed by Mr. Lewis.

[*38] Virginia tax credits to offset taxes owed for his 2007 tax year, and $6,333 of the Virginia tax credits to offset taxes owed for his 2008 tax year.

VII.   Audit and 2005 FPAA

Respondent issued an FPAA dated February 16, 2011, with respect to SWF's 2005 tax year.  The FPAA proposed the following adjustments to the partnership items reported on SWF's 2005 Form 1065:  (i) an adjustment to ordinary income of $1,677,143 based on an increase in gross receipts or sales, (ii) an adjustment of $1,677,143 to partner capital contributions made during the year, and (iii) an adjustment of $4,921,233 to charitable contributions.  With respect to the adjustments to ordinary income and partner capital contributions, respondent determined that SWF's receipt of purported capital contributions of $1,677,143 from Virginia Conservation in exchange for Virginia tax credits was a disguised sale pursuant to section 707.  Respondent determined that $124,857, the balance of the total funds of $1,802,000 received from Virginia Conservation, represented a capital contribution in exchange for a 1% percentage interest in SWF.  With respect to the adjustment to charitable contributions, on the basis of a valuation report prepared for respondent by Senior Appraiser Kenneth E. Baker, MSR, respondent determined that it has not been established that the value of the easement was more than $2,477,100.

**[\*39]**                                        OPINION

I.      Motions in Limine

As a preliminary matter, we address respondent's motions in limine to preclude testimony of Rex Linville and of McChesney Goodall III as expert witnesses.[36]  At trial, we allowed the testimony of both but took respondent's motion under advisement.  We find the testimony of both Mr. Linville and Mr. Goodall to be unhelpful with respect to the adjudication of the issues before us.  Accordingly, respondent's motions in limine will be denied as moot.

II.     Burden of Proof

Generally, the Commissioner's adjustments in an FPAA are presumed correct, and the party challenging the FPAA bears the burden of proving those adjustments are erroneous.  Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933); Crescent Holdings, LLC v. Commissioner, 141 T.C. 477, 485 (2013); see also Republic Plaza Props. P'ship v. Commissioner, 107 T.C. 94, 104 (1996) ("Petitioner bears the burden of proving that respondent's determinations in the FPAA are erroneous."); Clovis I v. Commissioner, 88 T.C. 980, 982 (1987)

---

[36]Respondent also submitted a motion in limine to preclude the testimony of David Nelms regarding the drafting and bases of the FPAA.  At trial petitioner released Mr. Nelms without calling on him to testify, and therefore we denied respondent's motion as moot.

**[\*40]** (holding that an FPAA is the functional equivalent of a notice of deficiency). The burden of proof may shift to the Commissioner when the Commissioner's position implicates a "new matter" not in the FPAA. See Rule 142(a)(1); Graev v. Commissioner, 140 T.C. 377, 379 n.3 (2013). Petitioner contends that respondent raised a new matter when, in his answer, he took the position that the VTC transaction was entirely a disguised sale and on this basis increased the deficiency from the $1,677,143 shown in the FPAA to $1,802,000. Specifically, petitioner contends that respondent abandoned (1) his position in the FPAA that the VTC transaction was partially a disguised sale pursuant to section 707(a)(2)(B), and (2) his position in his answer that Virginia Conservation was not a partner in SWF. Respondent argues that he did not raise any new issues in his answer and that he did not abandon his position that the VTC transaction was a disguised sale, but simply increased the deficiency from the amount shown on the FPAA; respondent argues that petitioner is therefore required to show that respondent's assessment is "without rational foundation" or "arbitrary and erroneous" to shift the burden of proof.

The burden of proof is relevant only when there is equal evidence on both sides, i.e., where the evidence is in "equipoise". See Dagres v. Commissioner, 136 T.C. 263, 279 (2011). "In a case where the standard of proof is preponderance of

**[*41]** the evidence and the preponderance of the evidence favors one party, we may decide the case on the weight of the evidence and not on an allocation of the burden of proof." Knudsen v. Commissioner, 131 T.C. 185, 189 (2008). We do not believe that the burden of proof affects the resolution in this case, because the preponderance of the evidence resolves the issues no matter which party has the burden. See Graev v. Commissioner, 140 T.C. at 393 n.8; Dagres v. Commissioner, 136 T.C. at 279. Consequently, we need not determine whether respondent raised a new matter or whether petitioner has successfully shifted the burden of proof.

III.     Issue 1. Whether the VTC Transaction Was a Disguised Sale

Respondent contends that the VTC transaction, which included Virginia Conservation's transfer of cash to SWF in exchange for Virginia tax credits, was a disguised sale pursuant to section 707.[37] Petitioner contends that the VTC

---

[37]In his answer, respondent raised as an alternative ground that (a) Virginia Conservation, while in form a partner in SWF, was not, in substance, a partner in SWF, (b) the alleged capital contribution of Virginia Conservation to SWF and receipt of Virginia tax credits in return were in substance a sale of the Virginia tax credits by SWF to Virginia Conservation, and (c) as a result of the substantive sale of the Virginia tax credits by SWF to Virginia Conservation, SWF should have recognized $1,802,000 in ordinary income for tax year 2005. However, in posttrial briefs respondent conceded that he "is not challenging the validity of the partner-partnership relationship between SWF and Virginia Conservation." Accordingly, we deem this issue to be conceded and do not discuss it further.

**[\*42]** transaction was not a disguised sale pursuant to section 707 but rather a contribution of cash by Virginia Conservation to SWF in exchange for a partnership interest and a subsequent allocation of Virginia tax credits.

### A.    Applicable Statutes and Regulations

Partnerships are considered passthrough entities and therefore are not subject to Federal income tax at the entity level.  Sec. 701.  Instead, a partnership's income or loss flows through to its individual partners.  See secs. 701 and 702.  When determining Federal income tax liability, each partner must include separately his or her distributive share of the partnership's taxable income or loss, among other things.  Sec. 702(a)(8).  As a general rule, a partner's distributive share of income, gain, loss, deduction, or credit is determined by the partnership agreement.  Sec. 704(a).

Generally, a partner may contribute capital to a partnership tax free and may receive a tax-free return of previously taxed profits through distributions except to the extent the distribution exceeds the partner's adjusted basis.  See secs. 721, 731.  These nonrecognition rules, however, do not apply to a transaction between a partnership and a partner not acting in his or her capacity as a partner.[38]  Sec.

---

[38]Petitioner contends that in the FPAA and at trial respondent conceded that Virginia Conservation was acting in its capacity as a partner and that SWF was a

(continued...)

[*43] 1.721-1(a), Income Tax Regs.; see sec. 707(a)(1). In those situations the transaction is recast as if it occurred between the partnership and one who is not a partner. Sec. 707(a)(1). Section 707 "prevents use of the partnership provisions to render nontaxable what would in substance have been a taxable exchange if it had not been 'run through' the partnership." Otey v. Commissioner, 70 T.C. 312, 317 (1978), aff'd, 634 F.2d 1046 (6th Cir. 1980).

One such nonrecognition transaction is commonly referred to as a disguised sale and is governed by section 707(a)(2). A disguised sale occurs when (1) a partner directly or indirectly transfers money or property to a partnership, (2) there is a related direct or indirect transfer of money or other property by the partnership to such partner, and (3) the transfers are properly characterized as a sale or exchange of property when viewed together. Sec. 707(a)(2)(B). In all cases the

---

[38](...continued)
bona fide partnership and therefore that sec. 707 does not apply in the case at hand. We disagree. Although respondent conceded that he "is not challenging the validity of the partner-partnership relationship between SWF and Virginia Conservation," respondent has not conceded that Virginia Conservation was acting in its capacity as partner. Moreover, respondent correctly contends that the existence of a valid partner-partnership relationship does not preclude the application of sec. 707 and that the partner may not be acting in his capacity as a partner during a purported transfer of property to the partnership, or vice versa. Sec. 1.707-3(a)(3), Income Tax Regs.; see also Route 231, LLC v. Commissioner, at *27. Accordingly, sec. 707 may apply in the instant case regardless of whether SWF is a bona fide partnership and Virginia Conservation is a bona fide partner.

[*44] substance of the transaction governs rather than its form. Sec. 1.707-1(a), Income Tax Regs.

Section 1.707-3(b)(1), Income Tax Regs.,[39] clarifies the third prong of section 707(a)(2)(B) and provides guidance with regard to which partnership transfers should be characterized properly as sales or exchanges of property. Pursuant to section 1.707-3(b)(1), Income Tax Regs., a disguised sale has occurred only if, on the basis of all of the facts and circumstances, (1) the transfer of money or other consideration would not have been made but for the transfer of property and (2) in cases in which the transfers are not made simultaneously, the subsequent transfer is not dependent on the entrepreneurial risks of partnership

---

[39]Sec. 1.707-3, Income Tax Regs., expressly applies in situations in which the partner transfers property to the partnership and the partnership transfers money or other consideration to the partner, i.e., the opposite of the VTC transaction. Sec. 1.707-6(a), Income Tax Regs., however, notes that rules similar to those in sec. 1.707-3, Income Tax Regs., apply to situations such as the VTC transaction, in which the partner transfers money to the partnership and the partnership transfers property to the partner. It is therefore appropriate to apply the rules provided in sec. 1.707-3, Income Tax Regs., in the instant case. See also Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d 129, 139 (4th Cir. 2011) (applying the rules in sec. 1.707-3(b)(1), Income Tax Regs., in a situation described in sec. 1.707-6(a), Income Tax Regs., in which a partner transferred money to the partnership in exchange for Virginia rehabilitation historic tax credits), rev'g and remanding T.C. Memo. 2009-295. As the instant case is appealable, absent stipulation to the contrary, to the U.S. Court of Appeals for the Fourth Circuit, we follow the decision of the Court of Appeals. Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

**[*45]** operations. Section 1.707-3(b)(2), Income Tax Regs., provides the following nonexhaustive list of 10 facts and circumstances that may tend to prove the existence of a disguised sale pursuant to section 1.707-3(b)(1), Income Tax Regs.:

(i) That the timing and amount of a subsequent transfer are determinable with reasonable certainty at the time of an earlier transfer;

(ii) That the transferor has a legally enforceable right to the subsequent transfer;

(iii) That the partner's right to receive the transfer of money or other consideration is secured in any manner, taking into account the period during which it is secured;

(iv) That any person has made or is legally obligated to make contributions to the partnership in order to permit the partnership to make the transfer of money or other consideration;

(v) That any person has loaned or has agreed to loan the partnership the money or other consideration required to enable the partnership to make the transfer, taking into account whether any such lending obligation is subject to contingencies related to the results of partnership operations;

(vi) That the partnership has incurred or is obligated to incur debt to acquire the money or other consideration necessary to permit it to make the transfer, taking into account the likelihood that the partnership will be able to incur that debt (considering such factors as whether any person has agreed to guarantee or otherwise assume personal liability for that debt);

[*46] (vii) That the partnership holds money or other liquid assets, beyond the reasonable needs of the business, that are expected to be available to make the transfer (taking into account the income that will be earned from those assets);

(viii) That partnership distributions, allocation or control of partnership operations is designed to effect an exchange of the burdens and benefits of ownership of property;

(ix) That the transfer of money or other consideration by the partnership to the partner is disproportionately large in relationship to the partner's general and continuing interest in partnership profits; and

(x) That the partner has no obligation to return or repay the money or other consideration to the partnership, or has such an obligation but it is likely to become due at such a distant point in the future that the present value of that obligation is small in relation to the amount of money or other consideration transferred by the partnership to the partner.

The weight that is afforded to each factor depends on the particular case. Id.

Moreover, transfers made between a partnership and a partner within a two-year period are "presumed to be a sale of the property to the partnership unless the facts and circumstances clearly establish that the transfers do not constitute a sale." Sec. 1.707-3(c)(1), Income Tax Regs.

B.    Caselaw

Although we have reviewed the application of section 707 to purported nonrecognition transactions on many occasions, see, e.g., Superior Trading, LLC

[*47] v. Commissioner, 137 T.C. 70 (2011), aff'd, 728 F.3d 676 (7th Cir. 2013); Canal Corp. v. Commissioner, 135 T.C. 199 (2010); Gateway Hotel Partners, LLC v. Commissioner, T.C. Memo. 2014-5, we have considered the application of section 707 specifically to purported transfers of Virginia State tax credits in two previous instances.  We analyze both of those cases and their applicability in the instant case.

      1.     Virginia Historic

In Va. Historic Tax Credit Fund 2001 LP v. Commissioner, T.C. Memo. 2009-295, 98 T.C.M. (CCH) 631, 633 (2009), rev'd and remanded, 639 F.3d 129 (4th Cir. 2011), three individuals created a web of partnerships (funds) in order to pass Virginia historic rehabilitation tax credits to investors.  One fund, the "source partnership", partnered with historic developers and became a 0.01% limited partner in selected historic property development partnerships to provide capital to those partnerships in exchange for Virginia historic rehabilitation tax credits.  Id., 98 T.C.M. (CCH) at 634-635; see also 639 F.2d at 133-134.  The funds solicited investors who were willing to contribute capital in exchange for the allocation of Virginia historic rehabilitation tax credits, promising that each investor would receive $1 in Virginia historic rehabilitation tax credits for every 74 cents to 80 cents of capital contributed.  Va. Historic Tax Credit Fund 2001 LP v.

**[\*48]** <u>Commissioner</u>, 98 T.C.M. (CCH) at 633-634. The funds also promised that each investor would receive a very small partnership interest in the funds, although the funds cautioned that the investors should not expect to receive any material amounts of partnership income or loss. <u>Id.</u> at 634, 638; <u>see also</u> 639 F.2d at 134. If the promised tax credits could not be obtained, the funds agreed to refund the investor's capital, net of expenses. <u>Va. Historic Tax Credit Fund 2001 LP v. Commissioner</u>, 98 T.C.M. (CCH) at 634.

The Commissioner determined, inter alia, that the transactions among the investors, the funds, and the development partnerships were disguised sales pursuant to section 707. <u>Id.</u> at 635. Because the transactions were not simultaneous and the investors faced entrepreneurial risks in the partnerships, this Court rejected the Commissioner's position and decided that the transactions were not disguised sales. <u>Id.</u> at 641. However, as noted <u>supra</u> note 39, the Commissioner appealed our decision to the Court of Appeals for the Fourth Circuit, which reversed and remanded our decision. <u>Va. Historic Tax Credit Fund 2001 LP v. Commissioner</u>, 639 F.3d at 146. The Court of Appeals[40] considered

---

[40]Before reviewing the factors to determine whether the transactions should properly characterized as sales, the Court of Appeals rejected the taxpayers' arguments that no transfer of property had occurred and that the credits were not transferred but rather allocated to the investors. <u>Va. Historic Tax Credit Fund</u>

(continued...)

[*49] the relevant factors enumerated in section 1.707-3(b)(2), Income Tax Regs., and held that those factors strongly suggested that the transactions were sales, "[p]articularly in light of the presumption that a sale occurred unless clearly demonstrated otherwise." Id. at 144. The Court of Appeals also concluded that, while this Court was free to conduct its own evaluation of entrepreneurial risk, our conclusions on the issue were flawed because the only risk the investors faced was that of an "advance purchaser who pays for an item with a promise of later delivery." Id. at 145.

2.   Route 231

In Route 231, LLC v. Commissioner, T.C. Memo. 2014-30, we encountered facts nearly identical to those in the instant case. In Route 231, the Commissioner issued an FPAA to the tax matters partner of Route 231 LLC (Route 231), a partnership that owned multiple parcels of land in Virginia. Id. at *2, *7. The partnership had entered into a transaction with Virginia Conservation in which Virginia Conservation contributed $3,816,000 to Route 231 in exchange for a 1% membership interest in Route 231 and an allocation of $7,200,000 in Virginia tax credits arising out of the charitable donation of conservation easements and a fee

---

[40](...continued)
2001 L.P. v. Commissioner, 639 F.3d at 140-142.

[*50] interest on parcels of land owned by Route 231.  Id. at *9, *11, *14-*15.

Route 231 and Virginia Conservation agreed to (1) a capital contribution of 53

cents per $1 of Virginia tax credits allocated to Virginia Conservation and (2) an

indemnity clause whereby  Route 231 and the partners other than Virginia

Conservation (the previous partners of the partnership) were jointly and severally

liable to indemnify Virginia Conservation if the Virginia tax credits were

disallowed.  Id. at *12, *15.  The previous partners of the partnership also had the

option to purchase all, but not less than all, of Virginia Conservation's

membership interest in Route 231 on or anytime after January 1, 2010.  Id. at *12.

The Commissioner contended that "Route 231 sold Virginia tax credits to

Virginia Conservation in exchange for cash and therefore engaged in a disguised

sale under section 707" and therefore that the capital contributions to the

partnership constituted ordinary income.  Id. at *22, *25.  After trial, the Tax

Court decided that the facts before the Court were squarely in point with those in

Va. Historic and, after applying Golsen v. Commissioner, 54 T.C. 742, 757 (1970),

aff'd, 445 F.2d 985 (10th Cir. 1971) (the Golsen rule),[41] that the transfer of

Virginia tax credits to Virginia Conservation in exchange for money should

---

[41]Golsen v. Commissioner, 54 T.C. at 757, established the rule that this
Court will "follow a Court of Appeals decision which is squarely in point where
appeal from our decision lies to that Court of Appeals".

**[\*51]** properly have been characterized as a disguised sale pursuant to section 707.

Route 231, LLC v. Commissioner, at \*35, \*38, \*41, \*45.

### 3. Application of Golsen Rule

Respondent's contentions in the instant case rely, in part, on the reasoning

and holding of the Court of Appeals for the Fourth Circuit in Va. Historic. As

noted above, according to the Golsen rule we follow a decision of the Court of

Appeals to which an appeal from our disposition of a case lies so long as that

decision is squarely in point and failure to follow that decision would result in an

inevitable reversal upon appeal. See Golsen v. Commissioner, 54 T.C. at 757; see

also Lardas v. Commissioner, 99 T.C. 490, 494-495 (1992). As the instant case is

appealable to the Court of Appeals for the Fourth Circuit, we will follow the

holdings of Va. Historic if the facts in the instant case are squarely in point with

those in Va. Historic.

However, petitioner contends that the facts in the instant case are not

squarely in point with those in Va. Historic. Petitioner specifically argues that

materially distinguishable facts include the nature of the partnerships involved and

the types of buyout rights arising after the transactions in question. In Route 231,

we considered whether the facts, which involved a transaction and partnership

nearly identical to the VTC transaction, were squarely in point with those in Va.

[*52] Historic.  Route 231, LLC v. Commissioner, at *35.  Although we noted some immaterial factual differences between the cases, including the nature of the State tax credits in issue, the ratios of credits allocated to capital contributed, and the partnership structures and their operating statuses, we ultimately decided that the controlling facts in Route 231 were squarely in point with those in Va. Historic.  Id., at *33-*35.  As we explained above, the VTC transaction is nearly identical to the transaction in Route 231.  Accordingly, as we concluded in Route 231, we similarly conclude that the facts in the instant case are squarely in point with those in Va. Historic, and we apply the holdings of Va. Historic in the instant case pursuant to the Golsen rule.

## C.    Analysis of the VTC Transaction as a Disguised Sale

We now turn to analyzing whether the VTC transaction constitutes a disguised sale pursuant to section 707(a)(2)(B) and section 1.707-3(b), Income Tax Regs.  However, because the parties agree that all of the relevant transfers of the VTC transaction occurred within a two-year period between December 2005 and April 2006, we presume pursuant to section 1.707-3(c)(1), Income Tax Regs., that the VTC transaction was a sale or exchange unless the facts and circumstances clearly establish that the transfers do not constitute a disguised sale.

**[*53]**      1.      Transfer of Money

Pursuant to section 707(a)(2)(B), there can be a disguised sale only if there is a direct or indirect transfer of money or other consideration from a partner to a partnership, or vice versa.  See sec. 1.707-3(a), Income Tax Regs.  Neither party disputes that, through the course of the VTC transaction, Virginia Conservation ultimately transferred $1,802,000 to SWF.  Accordingly, we conclude that the first prong of section 707(a)(2)(B) is satisfied because Virginia Conservation transferred money to SWF.

      2.      Transfer of Property

In addition to a transfer of money from the partner to the partnership, there can be a disguised sale only if there is a related direct or indirect transfer of property by the partnership to the partner.  See sec. 707(a)(2)(B); sec. 1.707-3(a), Income Tax Regs.  Respondent contends that SWF's transfer of Virginia tax credits to Virginia Conservation was a transfer of property.  Petitioner contends that (1) the Virginia tax credits were not property for purposes of section 707(a)(2)(B); and (2) the Virginia tax credits were allocated, and not transferred, to Virginia Conservation.  We disagree with both of petitioner's contentions.

**[\*54]** In <u>Va. Historic Tax Credit Fund 2001 LP v. Commissioner</u>, 639 F.3d at 140, the Court of Appeals addressed the issue of whether tax credits constitute property for purposes of section 707 and noted that the issue was a hybrid Federal and State law question. It compared the tax credits in issue in <u>Va. Historic</u> to a "bundle of sticks" where State law determined "which sticks are in a person's bundle" and Federal law determined whether the sticks qualify as property for purposes of a Federal statute. <u>Id.</u> (citing <u>United States v. Craft</u>, 535 U.S. 274, 278-279 (2002)). The Court of Appeals then asked whether the tax credits embodied "'some of the most essential property rights'", including the "'right to use the property, to receive income produced by it, and to exclude others from it'". <u>Id.</u> at 141 (quoting <u>Craft</u>, 535 U.S. at 283). It also considered "'the breadth of the control the taxpayer could exercise'" over the item and whether the item was "valuable." <u>Id.</u> (quoting <u>Drye v. United States</u>, 528 U.S. 49, 60-61 (1999)). The Court of Appeals determined that the tax credits in question were property; they had pecuniary value because they were used to "induce investors to contribute money" and the funds exercised proprietary control over the credits because they could "exclude others

[*55] from utilizing the credits and were free to keep or pass along the credits to partners as they saw fit."[42]  Id. at 141 (citing Craft, 535 U.S. at 283).

In Route 231, we applied the Court of Appeals for the Fourth Circuit's rationale in Va. Historic to the Virginia tax credits and decided that they were property for purposes of section 707 because they "were both valuable and imbued with essential property rights."  Route 231, LLC v. Commissioner, at *37.  In the instant case, we also apply the Court of Appeals' rationale in Va. Historic and similarly conclude that the Virginia tax credits were valuable and imbued with essential property rights because they induced Virginia Conservation to invest in SWF, and both SWF first and then Virginia Conservation had the right to use the Virginia tax credits on their State tax returns, benefit from the Virginia tax credits through a reduction of State tax liability, and exercise control over the Virginia tax credits to sell or transfer them in the State tax credit marketplace. Accordingly, in the instant case we conclude that Virginia tax credits are property for purposes of section 707.  See id. at *37; see also Tempel v. Commissioner, 136 T.C. 341, 354

_____

[42]The Court of Appeals also held that the State law prohibition against the direct sale or purchase of the tax credits in that case was a "nominal prohibition" that could be overcome by a third-party transfer via a partnership structure.  Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d at 141-142.  In the instant case there is no prohibition against direct sales or purchases of excess Virginia tax credits, making them more easily transferable than the tax credits in question in Va. Historic.

**[\*56]** (2011) (finding that Colorado tax credits created "cognizable property rights in those credits for the recipients of those credits"), aff'd sub nom. Esgar Corp. v. Commissioner, 744 F.3d 648 (10th Cir. 2014).

The Court of Appeals in Va. Historic also contemplated petitioner's contention that tax credits are allocated, and not transferred, to a partner. The Court of Appeals concluded that the argument was "tautological" and that the only way to determine whether a partnership and a partner were acting in their capacities as such during the transactions in questions was to consider all of the facts and circumstances pursuant to section 707 and section 1.707-3, Income Tax Regs. Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d at 140 n.13. Accordingly, we follow the holding of the Court of Appeals in Va. Historic and reject petitioner's contention. See also Route 231, LLC v. Commissioner, at *37-*38.

Consequently, we conclude that SWF's transfer of Virginia tax credits to Virginia Conservation during the VTC transaction constituted a transfer of property from a partnership to a partner pursuant to section 707(a)(2)(B).

### 3.    Proper Characterization as a Sale or Exchange

To decide whether the transfers between SWF and Virginia Conservation are properly characterized as a sale or exchange of property pursuant to section

[*57] 707(a)(2)(B)(iii), we must consider (1) whether Virginia Conservation would not have transferred $1,802,000 to SWF but for the corresponding transfer of $3,400,000 of Virginia tax credits from SWF to Virginia Conservation; and (ii) if we do not consider the transfers simultaneous, whether SWF's transfer was not dependent on the entrepreneurial risks of SWF's partnership operations. See sec. 1.707-3(b)(1), Income Tax Regs.

a.      The "But For" Test

We first consider whether Virginia Conservation would not have transferred $1,802,000 to SWF but for the corresponding transfer of $3,400,000 of Virginia tax credits from SWF to Virginia Conservation.

In Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.2d at 134, the funds promised (1) to provide each investor $1 in State tax credits for every 74 cent to 80 cents contributed and (2) to refund the investor if the credits could not be obtained. The Court of Appeals found that there was "no dispute" that the "but for" test was satisfied. Id. at 145. In Route 231, LLC v. Commissioner, at *35, *40, after applying the Golsen rule, we applied the Court of Appeals' holdings and rationale with regard to the "but for" test. We found that the parties had "expressly linked the amount of Virginia [t]ax [c]redits that Virginia Conservation received to the amount of money it transferred to" the partnership in question

[*58] because (1) Virginia Conservation had promised to make a contribution to the partnership equal to 53 cents for each $1 of Virginia Tax Credits allocated to it and was subsequently allocated the lion's share--97%--of Virginia tax credits despite holding only a 1% interest in the Route 231 partnership, and (2) the partnership and other partners in that case promised to indemnify Virginia Conservation for any Virginia tax credits disallowed and guaranteed implicitly that Virginia Conservation would receive all of the credits it expected to receive. Id. at *39.

In the instant case, Virginia Conservation similarly promised to contribute money to SWF equal to 53 cents for each $1 of Virginia tax credits allocated to it. Like the other partners (other than Virginia Conservation) in Route 231, petitioner and Mr. Lewis also agreed to indemnify Virginia Conservation if any Virginia tax credits were disallowed in the instant transaction. Moreover, when the donation of the easement on Sherwood Farm resulted in additional Virginia tax credits because of a higher-than-expected valuation, Virginia Conservation was granted the additional Virginia tax credits at a rate of 53 cents of additional capital contribution per $1 of additional Virginia tax credits. Virginia Conservation was ultimately allocated 92%--the "lion's share"--of the Virginia tax credits despite holding only 1% of membership interests in SWF. As we did in Route 231, we

[*59] find that the material facts are squarely in point with those in Virginia Historic, and we conclude that Virginia Conservation would not have transferred money to SWF but for the corresponding transfer of Virginia tax credits to Virginia Conservation.

b.      Presence of Entrepreneurial Risks

We next consider whether SWF's transfer of Virginia tax credits was not dependent on the entrepreneurial risks of SWF's partnership operations.[43]

In Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d at 145, the Court of Appeals held that the investors did not face any true entrepreneurial risk because, among other things, (1) there was a fixed rate of return on investment instead of any share in partnership profits tied to the investor's partnership interests and (2) the investors were secured against losing their contributions because the funds promised a refund if the credits could not be delivered or were revoked. The Court of Appeals held that the only risk in that case was one of "any advance purchaser who pays for an item with a promise of later delivery" and

_____

[43]Respondent contends that the transfers of money and of credits in the VTC transaction were simultaneous, suggesting that it is beyond the application of sec. 1.707-3(b)(1)(ii), Income Tax Regs. Because we conclude that the transfer of Virginia tax credits did not depend on any entrepreneurial risks of SWF's operations, we do not address and do not decide the issue of whether the transfers were simultaneous. See Route 231, LLC v. Commissioner, at *40; see also Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d at 143 n.17, 145.

[*60] distinguished that risk from that of an entrepreneur, who "puts money into a venture with the hope that it might grow in amount but with the knowledge that it may well shrink." Id. at 145-146 (citing Commissioner v. Tower, 327 U.S. 280, 287 (1946)).

In the instant case, Virginia Conservation was promised a legally enforceable, fixed rate of return of $1 of Virginia tax credits for every 53 cents contributed and was shielded from suffering any loss of Virginia tax credits through an indemnity clause that required SWF and Mr. Lewis to indemnify Virginia Conservation for any of its Virginia tax credits that were disallowed or revoked. In Route 231, LLC v. Commissioner, at *40-*41, we applied the rationale and holding of the Court of Appeals in Va. Historic in a nearly identical transaction and held that those two facts were indicative of a transfer of credits that was not dependent on entrepreneurial risks. Similarly, we again find the facts in the instant case to be squarely in point with those in Va. Historic and apply the holdings therein in the instant case pursuant to the Golsen rule. Additionally, although they represented that they "had obtained sufficient information * * * to evaluate the merits and risks of an investment" in SWF, there is no indication that Mr. Shaw, Mr. Brower, or any other representative party for Virginia Conservation reviewed the relevant financial records pertaining to SWF's business; Virginia

[*61] Conservation was solely interested in the VTC transaction in issue rather than the ongoing SWF farming business. See also Route 231, LLC v. Commissioner, at *40-*41 ("[T]here is no indication in the record that Virginia Conservation even considered Route 231's operations before it agreed to contribute a substantial amount of money[.]"). On the basis of the foregoing, we conclude that SWF's transfer of Virginia tax credits to Virginia Conservation was not dependent upon the entrepreneurial risks of SWF's business.

c.     Consideration of Facts and Circumstances

After analyzing whether the VTC transaction properly could be characterized as a sale or exchange pursuant to section 1.707-3(b)(1), Income Tax Regs., we also consider the application of the facts and circumstances listed in section 1.707-3(b)(2), Income Tax Regs., to the VTC transaction.[44] Although that section lists 10 relevant factors, we review only those which are relevant to the VTC transaction.[45]

---

[44]In Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d at 144, the Court of Appeals stated that although the factors listed in sec. 1.707-3(b)(2), Income Tax Regs., are significant to the determination of "entrepreneurial risk", this Court is free to conduct its own evaluation of entrepreneurial risk outside of those factors.

[45]In the instant case we question the relevance of four of the factors to our facts. Sec. 1.707-3(b)(2)(iv) and (v), Income Tax Regs., requires consideration of

(continued...)

**[*62]** The first factor we consider is whether the timing and amount of the transfer of Virginia tax credits were determinable with reasonable certainty at the time of Virginia Conservation's transfer of money to SWF. See sec. 1.707-3(b)(2)(i), Income Tax Regs. In Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d at 143, the Court of Appeals concluded that this factor applied because the partnership had promised (1) a precise number of credits in exchange for the contribution and (2) delivery of the credits for use during a specified tax year. In the instant case SWF promised $1 of Virginia tax credits to Virginia Conservation for every 53 cents contributed by Virginia Conservation to SWF. Petitioner

---

[45](...continued)
whether any person "has made or is legally obligated to make contributions" or "has loaned or has agreed to loan" to SWF money or other consideration that would enable SWF to transfer Virginia tax credits to Virginia Conservation. Similarly, sec. 1.707-3(b)(2)(vi), Income Tax Regs., requires consideration of whether SWF had incurred or was required to incur debt to acquire the money or other consideration necessary to enable a transfer of Virginia tax credits to Virginia Conservation. Although the members of SWF agreed to contribute additional capital upon the reasonable demands of SWF's business, there is no evidence of a specific contribution, loan, or agreement or obligation to lend or contribute any money or other consideration to SWF from any person to specifically enable the VTC transaction. Similarly, there is no evidence that SWF had incurred or was required to incur debt to enable the transfer of Virginia tax credits to Virginia Conservation. Moreover, because SWF already owned Sherwood Farm and thus could record the easement deed, complete administrative paperwork, and procure the necessary Virginia tax credits, any such contribution, loan, or debt would have been unnecessary. Accordingly, we conclude that sec. 1.707-3(b)(2)(iv), (v), and (vi), Income Tax Regs., is irrelevant to the instant transaction.

**[\*63]** contends that the ratio does not result in a reasonably certain amount of credits because the underlying valuation of the easement was uncertain. However, when the second valuation of the easement created more Virginia tax credits than originally expected, Virginia Conservation was given the first opportunity to obtain the additional Virginia tax credits with an additional contribution at the same ratio, indicating that the amount of Virginia tax credits attained was directly calculated from the amount of money that Virginia Conservation contributed. At trial Mr. Lewis testified that his understanding of the transaction was that the amount of Virginia Conservation's capital contribution to SWF was based directly on the amount of Virginia tax credits to be transferred or allocated to Virginia Conservation. On the basis of the foregoing, we find that Virginia Conservation could precisely determine the number of Virginia tax credits it could expect to receive on the basis of the amount of money it contributed to SWF. Moreover, in the operating agreement, SWF agreed to record the easement on or before December 31, 2005, so that Virginia Conservation could use the resulting Virginia tax credits on its 2005 income tax return.[46] Accordingly, we conclude that

---

[46]Petitioner contends that the availability of the Virginia tax credits was uncertain until VDOT certified the earned credits and actively issued them. We disagree. As we previously explained in Route 231, LLC v. Commissioner, at \*46-\*47, and explain in greater detail below, certification was not required to use

(continued...)

[*64] Virginia Conservation knew with reasonable certainty that the Virginia tax credits would be available for use on Virginia Conservation's 2005 tax returns. Consequently, we conclude that this factor weighs in favor of treating the VTC transaction as a disguised sale. See also Route 231, LLC v. Commissioner, at *41-*42.

The second factor we consider is whether Virginia Conservation had a legally enforceable right to the later transfer of Virginia tax credits. See sec. 1.707-3(b)(2)(ii), Income Tax Regs. In Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d at 143, the Court of Appeals concluded that this factor indicated a disguised sale because the subscription agreements explicitly promised delivery of tax credits in exchange for capital contributions and the investors could have pursued breach of contract claims if those credits were not delivered. According to the operating agreement, Virginia Conservation was promised $3,050,000 of Virginia tax credits, a figure that was later increased because of the presence of additional Virginia tax credits. Moreover, the subscription agreement stated that Virginia Conservation's capital contribution would entitle it to receive

---

[46](...continued)
the Virginia tax credits arising from conveyances made before 2007. A taxpayer earned and was able to use a Virginia tax credit once "he or she satisfied the statutory requirements" for the credits; the VDOT "merely acknowledged and registered the credits to create an accounting track record." Id. at *46.

[*65] from SWF an allocation of $3,050,000 of Virginia tax credits for its contribution of $1,616,500. If SWF, Mr. Lewis, and petitioner had failed to fulfill the terms of those agreements, Virginia Conservation could have pursued breach of contract claims. Accordingly, we conclude that Virginia Conservation had a legally enforceable right to the later transfer of Virginia tax credits. Consequently, we conclude that this factor weighs in favor of finding a disguised sale.

The third factor we consider is whether Virginia Conservation's right to receive the Virginia tax credits was secured in any manner. See sec. 1.707-3(b)(2)(iii), Income Tax Regs. In Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d. at 143, the Court of Appeals defined "secured" broadly and concluded that the right to receive tax credits was secured because the partnerships promised that the investors' capital and contributions would be refunded if the sufficient credits could not be obtained, were revoked, or were not delivered. See also Route 231, LLC v. Commissioner, *43. In the instant case, the indemnity clause in the subscription agreement guaranteed that Mr. Lewis and SWF would indemnify Virginia Conservation if any of the Virginia tax credits that it expected to receive pursuant to the VTC transaction were disallowed or reduced. Moreover, SWF was required to record the easement deed by December 31, 2005, to ensure that Virginia Conservation would obtain Virginia tax credits to be used

[*66] on its 2005 tax returns. Accordingly, we conclude that Virginia Conservation's right to receive the Virginia tax credits was secured: Either Virginia Conservation would receive Virginia tax credits for its 2005 tax year or it would receive a refund of its payment to SWF. Consequently, we conclude that this factor weighs in favor of finding a disguised sale.

The fourth factor we consider is whether SWF held Virginia tax credits, beyond the reasonable needs of SWF's business, that were expected to be available to make the transfer to Virginia Conservation. See sec. 1.707-3(b)(2)(vii), Income Tax Regs.; see also sec. 1.707-6(a), Income Tax Regs. Both the Court of Appeals in Va. Historic and this Court in Route 231 concluded that this factor was irrelevant to their respective facts, and we also question its relevance to the instant case. See Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d at 144 n.19 (finding that this factor was "not of particular relevance to the way the instant transactions were structured"); Route 231,LLC v. Commissioner, at *29-*30 n.5 (finding that this factor was irrelevant because the partnership in question "was not engaged in a business at the time of the transfers"). However, we note that SWF agreed to represent and warrant that it had not used and would not use any portion of the Virginia tax credits allocated to Virginia Conservation to offset or satisfy its State income tax liability for any year

[*67] and that it had not transferred and would not transfer the Virginia tax credits allocated to Virginia Conservation to any other taxpayer beyond the $300,000 of Virginia tax credits allocated to petitioner. Moreover, when the second valuation of the easement created more Virginia tax credits than originally expected, SWF held the additional Virginia tax credits, beyond what was reasonably necessary for SWF's business, for potential transfer to Virginia Conservation, rather than for use by SWF or transfer or sale to another party. Consequently, we conclude that this factor weighs, albeit less so than the other factors, in favor of finding a disguised sale.

The fifth factor we consider is whether SWF's transfer of Virginia tax credits to Virginia Conservation was disproportionately large in relationship to Virginia Conservation's general and continuing interest in SWF's profits. See sec. 1.707-3(b)(2)(ix), Income Tax Regs. In Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d at 144, the Court of Appeals concluded that this factor indicated a disguised sale because each investor's 0.01% partnership interest, from which the investors were told to expect no material amount of partnership profit, had no correlation to the amount of tax credits transferred to that investor; instead, the transfer of tax credits was tied to the amount of money that the investor contributed to the fund. In Route 231, LLC v. Commissioner, at

**[*68]** *44, we held that this factor indicated a disguised sale because Virginia Conservation held a 1% interest in partnership profits and losses and distribution of net cashflow but received 97% of the available Virginia tax credits. In the instant case, Virginia Conservation held a 1% interest[47] in partnership profits and losses and net cashflow, but was ultimately allocated 92% of the Virginia tax credits available to SWF. The amount of Virginia tax credits that Virginia Conservation received in the instant case was proportionate to the amount of money it contributed to SWF, and not to its partnership interest in SWF. See Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d at 144; Route 231, LLC v. Commissioner, at *44. We conclude that SWF's transfer of Virginia tax credits to Virginia Conservation was disproportionately large in relationship to Virginia Conservation's general and continuing interest in SWF's profits. Consequently, we hold that this factor weighs in favor of finding a disguised sale.

The sixth, and final, factor we consider is whether Virginia Conservation has an obligation to return the Virginia tax credits to SWF. See sec. 1.707-

---

[47]We note that the parties originally intended the interest to be nonvoting and that, pursuant to the option agreement, Mr. Lewis had the option to purchase all of Virginia Conservation's interests in SWF on or after January 1, 2010. The option agreement was even referred to as "the vehicle that gets * * * [Mr. Brower] out of the deal." Accordingly, even though Virginia Conservation obtained a 1% interest in SWF, we conclude that the parties endeavored to limit the potential control and longevity of that interest.

**[*69]** 3(b)(2)(x), Income Tax Regs.  In <u>Va. Historic Tax Credit Fund 2001 LP v. Commissioner</u>, 639 F.3d at 144, the Court of Appeals concluded that this factor indicated a disguised sale because the investors had no further obligations to the partnership and "were free to use the credits for their own benefit."  <u>See also</u> <u>Route 231, LLC v. Commissioner</u>, at *44-*45.  In the instant case, after receiving the Virginia tax credits, Virginia Conservation was free to use or transfer the credits as it desired; it had no further obligations to SWF with regard to the Virginia tax credits.  Consequently, we conclude that this factor weighs in favor of finding a disguised sale.

Upon consideration of the foregoing factors and in the light of the holdings of the Court of Appeals in <u>Va. Historic</u>, we conclude that the VTC transaction is properly characterized as a sale or exchange pursuant to section 1.707-3(b), Income Tax Regs.

D.    <u>Conclusion</u>

After reviewing the facts of the instant case and in the light of the holdings of the Court of Appeals in <u>Va. Historic</u>, we conclude that the VTC transaction included a transfer of money from Virginia Conservation to SWF and a related transfer of Virginia tax credits from SWF to Virginia Conservation that, when viewed together, are properly characterized as a sale or exchange of property

[*70] pursuant to section 707(a)(2)(B). Additionally, as the record establishes that the VTC transaction constitutes a sale, our conclusion is consistent with the presumption that applies under section 1.707-3(c)(1), Income Tax Regs. Consequently, we hold that SWF engaged in a disguised sale pursuant to section 707(a) when it engaged in the VTC transaction with Virginia Conservation.

IV.   Issue 2.  Whether Proceeds From the Disguised Sale Are Income to SWF for Its 2005 Tax Year

Because we have concluded above that the VTC transaction was a disguised sale pursuant to section 707, we must decide whether the income from the disguised sale was reportable with respect to the 2005 tax year. Respondent contends that proceeds of the disguised sale were reportable as income to SWF with respect to its 2005 tax year, which was the year when the sale occurred. Petitioner contends that income from the disguised sale was not reportable for the 2005 tax year because (1) any disguised sale could not be completed until 2006, when (i) the Virginia tax credits were registered by VDOT and (ii) the conditions of the escrow agreement were met, and (2) SWF did not actually or constructively receive any of Virginia Conservation's $1,802,000 payment during 2005.

**[*71]** A.     Timing of the Disguised Sale

A disguised sale is considered to take place on the date that, under general principles of Federal tax law, the partnership is considered the owner of the property. Sec. 1.707-3(a)(2), Income Tax Regs.; see also United States v. Irvine, 511 U.S. 224, 238-239 (1994). If the transfer of money or other consideration from the partnership to the partner occurs after the transfer of property to the partnership, the partner and partnership are treated as if, on the date of the sale, the partnership transferred to the partner an obligation to transfer to the partner money or other consideration. Sec. 1.707-3(a)(2), Income Tax Regs. Similar rules apply when property is transferred from the partnership to the partner, and the partner subsequently transfers money to the partnership. See Route 231, LLC v. Commissioner, at *49; sec. 1.707-6(a), Income Tax Regs. In the instant case, a disguised sale is considered to have taken place when Virginia Conservation is considered to have become the owner of the Virginia tax credits.

State law determines and governs the nature of property rights while Federal law determines the appropriate Federal tax treatment of those rights. See Keith v. Commissioner, 115 T.C. 605, 611 (2000). "The term 'sale' is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay." Grodt & McKay Realty, Inc. v.

[*72] Commissioner, 77 T.C. 1221, 1237 (1981) (citing Commissioner v. Brown, 380 U.S. 563, 570-571 (1965)). A sale occurs for Federal income tax purposes when there has been a transfer of the benefits and burdens of ownership; this is a question of fact that must be ascertained from the intention of the parties as evidenced by a written agreement read in the light of the attending facts and circumstances. Id.

This Court has considered the following factors in considering whether a transfer of the benefits and burdens of ownership has occurred: (1) whether legal title passed; (2) how the parties treated the transaction; (3) whether an equity interest in the property was acquired; (4) whether the contract created a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession was vested in the purchasers; (6) which party paid the property tax; (7) which party bore the risk of loss or damage to the property; and (8) which party received the profits from the operation and sale the property. Calloway v. Commissioner, 135 T.C. 26, 33-34 (2010), aff'd, 691 F.3d 1315 (11th Cir. 2012); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. at 1237-1238; see also Smith v. Commissioner, 820 F.2d 1220, 1987 WL 37627, at *3-*5 (4th Cir. 1987) (affirming this Court's use of the Grodt & McKay Realty factors to decide whether the benefits and burdens of

**[*73]** ownership had been transferred), aff'g without published opinion T.C. Memo. 1985-567; United States v. HedgeLender, LLC, 107 A.F.T.R.2d (RIA) 2011-2625 (E.D. Va. 2011) (applying the Grodt & McKay Realty factors to decide whether a transfer of property constituted a sale). Accordingly, we consider seven of these factors relevant[48] to analyze when the benefits and burdens of ownership of the Virginia tax credits were transferred from SWF to Virginia Conservation.

The first factor we consider is when legal title to the Virginia tax credits passed from SWF to Virginia Conservation. In Route 231, LLC v. Commissioner, at *47-*48, *51, we held that Virginia law in 2005 required a taxpayer to hold a tax credit before transferring it; therefore, a taxpayer was considered to hold legal title to a tax credit before a subsequent transfer. Va. Code Ann. sec. 58.1-513(C) (West 2005). Petitioner contends that the transfer of Virginia tax credits could not occur until 2006 after the VDOT registered the credits. We disagree. During 2005, a taxpayer was not required to apply to the VDOT in order to receive a Virginia tax credit. See id. sec. 58.1-512. During 2005, Va. Code Ann. sec. 58.1-512 provided that a taxpayer could receive a Virginia Tax Credit for land preservation if (1) the taxpayer made a qualified donation of land or an interest in

---

[48]We note that the sixth factor, which asks us to consider which party paid the property tax, is irrelevant to the instant case because there are no property taxes due on the Virginia tax credits

[*74] land; (2) a qualified appraisal prepared by a qualified appraiser substantiated the fair market value of the donation; (3) the qualified appraisal was signed by the qualified appraiser, who had to be licensed in Virginia, and a copy of the appraisal was submitted to the VDOT; (4) the qualified donation was made to the Commonwealth of Virginia, an instrumentality thereof, or a qualified charitable organization; and (5) the preservation or similar use and purpose of such property was assured in perpetuity. See also Route 231, LLC v. Commissioner, at *46. Accordingly, for conveyances during 2005[49] a taxpayer earned and held a Virginia Tax Credit when the taxpayer satisfied the statutory requirements for the credits; the VDOT merely acknowledged and registered the credits to create an accounting track record. Id. The parties do not dispute that SWF's easement on Sherwood Farm met the requirements of Va. Code Ann. sec. 58.1-512 as prescribed during 2005. On December 30, 2005, the easement deed was recorded with the Clerk's Office of the Circuit Court for Albemarle County. At that moment SWF held the

---

[49]In 2006, however, Virginia changed the statutory requirements applicable to the Virginia tax credits for conveyances made on or after January 1, 2007. Among other things, Virginia expressly required a taxpayer to "apply for a credit after completing the donation by submitting a form or forms prescribed by * * * [the VDOT]" before he or she would be issued Virginia tax credits for donations made on or after January 1, 2007. Va. Code Ann. sec. 58.1- 512(D)(1) (West 2007). Thus, the VDOT began to actively issue the credits only with respect to conveyances made during 2007. See Route 231, LLC v. Commissioner, at *46-*47.

[*75] Virginia tax credits originating from the easement on Sherwood Farm.[50]

SWF then transferred some of those Virginia tax credits to Virginia Conservation, and Virginia Conservation subsequently transferred them to Chesterfield Conservancy for additional transfers to individual taxpayers to be used on their 2005 tax returns. These transfers could not have occurred unless SWF and then Virginia Conservation had acquired and held the Virginia tax credits during 2005. See Route 231, LLC v. Commissioner, at *48. Accordingly, we conclude that legal title to the Virginia tax credits passed from SWF to Virginia Conservation during 2005.

The second factor we consider is how SWF and Virginia Conservation treated the VTC transaction. In Route 231, we considered the terms and effective dates of the transactional agreements and the parties' tax returns as indicators of the parties' intent as to the timing of the transaction. Id. at *51-*52. In the instant case, each of the relevant transactional documents was effective on or before December 31, 2005. Both the escrow agreement and the operating agreement contained terms that indicated a mutual understanding that SWF was to record the easement, admit Virginia Conservation as a partner, and earn the Virginia tax

_____

[50]We also note that the credit acknowledgment letter from the VDOT, dated March 30, 2006, reported 2005 as the effective year for the Virginia Tax Credit.

**[\*76]** credits on or before December 31, 2005. Moreover, on its Form 1065 for its 2005 tax year, SWF reported receiving during 2005 a purported capital contribution from Virginia Conservation of $1,802,000 for a 1% interest in the income, losses, and capital of SWF. On LPC #1, as well as on a Schedule VK-1 filed with its Form 502 for its 2005 tax year, SWF reported an allocation of $3,400,000 in Virginia tax credits to Virginia Conservation. On the basis of the foregoing, we conclude that SWF and Virginia Conservation treated the VTC transaction as having occurred during 2005.

The third factor we consider is when Virginia Conservation acquired an equity interest in the Virginia tax credits. In Route 231 we held that an equity interest was acquired when Virginia Conservation, the acquirer of tax credits in that case, was able to pass or keep the credits without restriction and could exclude others from using the tax credits. In the instant case Virginia Conservation was able to use or transfer the Virginia tax credits during the 2005 tax year and actually transferred them to Chesterfield Conservancy for subsequent transfers to individuals for use on their 2005 tax returns. Until Virginia Conservation's transfer of the Virginia tax credits to Chesterfield Conservancy, which also occurred during 2005, it had exclusive control to either use or transfer

**[\*77]** the Virginia tax credits. On the basis of the foregoing, we find that Virginia Conservation acquired an equity interest in the Virginia tax credits during 2005.

The fourth factor we consider is whether SWF had a present obligation to execute and deliver a deed and Virginia Conservation had a present obligation to make payments. Because the transaction in the instant case was structured as a partnership allocation, there was no deed to be executed and delivered to indicate a transfer of Virginia tax credits. Instead, SWF was obligated to ensure that the easement deed was recorded and the Virginia tax credits were earned on or before December 31, 2005, to admit Virginia Conservation as a partner on or before December 31, 2005, and to make a partnership allocation of Virginia tax credits to Virginia Conservation effective for the 2005 tax year. In exchange, pursuant to the escrow agreement and subscription agreement, Virginia Conservation was required to transfer funds to Mr. Skeen's attorney trust account; those funds would only be returned to Virginia Conservation if SWF did not record the easement deed or admit Virginia Conservation as a partner on or before December 31, 2005. On the basis of the foregoing, we find that, as of December 31, 2005, SWF had a present obligation to transfer Virginia tax credits to Virginia Conservation and that Virginia Conservation had a present obligation to transfer money to an escrow account for ultimate distribution to SWF.

[*78] The fifth factor we consider is whether the right of possession of the Virginia tax credits was vested in Virginia Conservation. As we discussed above, Virginia Conservation was able to use or transfer the Virginia tax credits during the 2005 tax year and actually transferred them to Chesterfield Conservancy for subsequent transfers to individuals for use on their 2005 tax returns. These transfers could not have occurred unless SWF and then Virginia Conservation had acquired and possessed the Virginia tax credits during 2005. See Route 231, LLC v. Commissioner, at *48, *53. On the basis of the foregoing, we find that the right of possession over the Virginia tax credits was vested with Virginia Conservation during 2005.

The sixth factor we consider is whether SWF or Virginia Conservation bore the risk of loss or damage to the Virginia tax credits. Because the Virginia tax credits are intangible property, we consider which party to the VTC transaction bore any loss from a decrease in economic value. See Calloway v. Commissioner, 135 T.C. at 36; Route 231, LLC v. Commissioner, at *53. In the instant case, although Virginia Conservation held the Virginia tax credits only for a brief time, it would have borne the risk of a decline in the value of the Virginia tax credits on the open market during that period. However, Virginia Conservation was also shielded from some risk of loss through an indemnity clause that required SWF

[*79] and Mr. Lewis to indemnify Virginia Conservation for any of its Virginia tax credits that were disallowed or revoked by the VDOT or the IRS. In Route 231, LLC v. Commissioner, at *53-*54, confronted with an identical set of facts, we found that both parties bore the risk of loss and, therefore, that this factor was neutral. Accordingly, we similarly conclude that both Virginia Conservation and SWF bore the risk of loss with respect to the Virginia tax credits. Consequently, we conclude that this factor is neutral.

The seventh and final factor we consider is whether SWF or Virginia Conservation would have received any profits from the operation and sale of the Virginia tax credits. As we discussed above, Virginia Conservation was able to use the Virginia tax credits to decrease its own 2005 tax liability or transfer the Virginia tax credits for profit during 2005; in fact, Virginia Conservation actually transferred the Virginia tax credits to Chesterfield Conservancy for subsequent transfers to individuals for use on their 2005 tax returns. Accordingly, we find that, during the 2005 tax year, Virginia Conservation would have received any profits from the operation and sale of the Virginia tax credits.

Upon consideration of the foregoing factors, we conclude that, for Federal tax purposes, Virginia Conservation should be treated as the owner of the Virginia tax credits on or before December 31, 2005. See id. at *54. Consequently, we

[*80] conclude that the disguised sale of Virginia tax credits from SWF to Virginia Conservation took place on or before December 31, 2005.

B.    Recognition of Income From the Disguised Sale

Section 61(a) provides generally that gross income means all income from whatever source derived.  Section 61(a)(3) provides that gross income includes gains derived from dealings in property.  See also sec. 1.61-6, Income Tax Regs.  Section 1001(a) provides that the gains from the sale or other disposition of property shall be the excess of the amount realized over the adjusted basis.  Unless otherwise provided, the entire amount of the gain or loss on the sale of the property is recognized.  Sec. 1001(c).

Generally, a taxpayer is required to include gains, profits, and income in gross income for the taxable year in which he or she actually or constructively received them unless they are otherwise includible for a different year in accordance with the taxpayer's method of accounting.  Sec. 451(a); sec. 1.451-1(a), Income Tax Regs.  SWF is a cash method taxpayer and, therefore, income is taxable to it upon receipt.  Under the cash receipts method of accounting, an amount of income is includible in gross income only when it is actually or constructively received.  Sec. 1.451-1(a), Income Tax Regs.  "Constructive receipt" is defined in section 1.451-2(a), Income Tax Regs., as follows:

**[*81]** (a) <u>General rule</u>.--Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * *

Petitioner contends that there was no actual or constructive receipt of the $1,802,000 in cash by SWF during 2005. Specifically, petitioner contends that Virginia Conservation paid the $1,802,000 into an escrow account during December 2005 and that SWF's right to receive the funds from escrow were limited by the following conditions precedent: (1) receipt of a credit transaction number with respect to the Virginia tax credits originating from the easement; (2) evidence of recordation of the easement deed with the Clerk's Office of the Circuit Court of Albemarle County; (3) a report of title issued by Chicago Title; and (4) written authorization from Virginia Conservation's counsel to release the funds. Petitioner contends that those conditions precedent were "substantial limitations or restrictions" and that because all four were not completed before April 2006, any income from the disguised sale of Virginia tax credits should not be recognized for the 2005 tax year. Although petitioner is correct that the credit transaction number and the title report were not received before March 2006 and that Mr. Shaw did

[*82] not authorize disbursement of the escrow funds in writing until April 2006, we disagree with petitioner's contention that these conditions preclude recognition of income for 2005. In Route 231, we reviewed a factual situation similar to the one before us, including the transfer of funds pursuant to an escrow agreement with nearly identical terms. We held that requirements to "provide to Virginia Conservation the credit transaction number, the evidence of recordation of the deed of gift, the new owner's policy, and disbursement authorization from Virginia Conservation's counsel * * * were ministerial and not conditions precedent." Route 231, LLC v. Commissioner, at *56 n.7. Instead, we focused on conditions in the escrow agreement that controlled whether the escrow funds would be returned to Virginia Conservation to determine when income should be recognized. Id. at *56. In the instant case, the escrow agreement provided that Mr. Skeen would return the escrow funds to Virginia Conservation only if (1) the deed of the easement was not recorded in the Clerk's Office of the Circuit Court of Albemarle County on or before December 31, 2005, or (2) Virginia Conservation was not admitted as a 1% partner in SWF on or before December 31, 2005. The parties do not dispute that both of these acts occurred on or before December 31, 2005. At that point, regardless of when or whether (1) Virginia Conservation received the credit transaction number, evidence of recordation of the easement,

**[*83]** and title report and (2) Mr. Shaw authorized disbursement, Virginia Conservation could no longer retrieve the funds from the escrow account and SWF's right to the escrowed funds had vested.[51]  See id. at *56.  Accordingly, we conclude that the remaining tasks, i.e., Virginia Conservation's receipt of the credit transaction number, evidence of easement, and title report, and Mr. Shaw's authorization, were merely ministerial in nature and did not constitute conditions precedent to SWF's right to the escrowed funds.  Consequently, these conditions are not "substantial limitations or restrictions" pursuant to section 1.451-2(a), Income Tax Regs.  See Turner v. Commissioner, T.C. Memo. 1964-161, aff'd, 343 F.2d 150 (4th Cir. 1965).

However, the constructive receipt doctrine is inapplicable to the facts before us for reasons other than petitioner's contention.  The constructive receipt doctrine requires a taxpayer who is on the cash method of accounting to recognize income when the taxpayer has an unqualified, vested right to receive immediate payment of income.  See Ross v. Commissioner, 169 F.2d 483, 490 (1st Cir.1948), rev'g and remanding on another issue a Memorandum Opinion of this Court; Martin v. Commissioner, 96 T.C. 814, 823, (1991); Amend v. Commissioner, 13 T.C. 178,

_____

[51]During January 2006, Mr. Gecker admitted that Virginia Conservation had received what it had bargained for and that "it [was] unlikely that [they would] get the money back."

**[*84]** 185 (1949). The constructive receipt doctrine prevents a creditor from

"'deliberately turn[ing] his back upon the income and thus select[ing] the year for

which he will report it.'"[52] Gale v. Commissioner, T.C. Memo. 2002-54, 83

T.C.M. (CCH) 1270, 1278 (2002) (quoting Hamilton Nat'l Bank v.

Commissioner, 29 B.T.A. 63, 67 (1933)). We have previously held that there is

no need to consider the constructive receipt doctrine if a taxpayer does not delay a

payment due to him. See id., 83 T.C.M. (CCH) at 1278. SWF did not delay the

escrowed funds from being distributed to it. Accordingly, we conclude that there

is no need to consider the application of the constructive receipt doctrine to the

facts before us.

---

[52]The probable purpose for development of the doctrine of constructive receipt was stated as follows in Ross v. Commissioner, 169 F.2d 483, 491 (1st Cir. 1948):

"The doctrine of constructive receipt was, no doubt, conceived by the Treasury in order to prevent a taxpayer from choosing the year in which to return income merely by choosing the year in which to reduce it to possession. Thereby the Treasury may subject income to taxation when the only thing preventing its reduction to Possession is the volition of the taxpayer." * * *

Hornung v. Commissioner, 47 T.C. 428, 434 (1967) (alteration in original).

[*85] Instead, we consider whether the economic benefit theory applies to the facts before us. Unlike the doctrine of constructive receipt,[53] the economic benefit theory states that a taxpayer must recognize income for the taxable year in which any economic or financial benefit is conferred. Zorc v. Commissioner, T.C. Memo. 1990-620, 60 T.C.M. (CCH) 1399, 1401 (1990) (citing Anastasio v. Commissioner, 67 T.C. 814 (1977), aff'd without published opinion, 573 F.2d 1287 (2d Cir. 1977), and Sproull v. Commissioner, 16 T.C. 244 (1951), aff'd, 194 F.2d 541 (6th Cir. 1952)); see also Jacuzzi v. Commissioner, 61 T.C. 262, 268 (1973). Pursuant to the economic benefit theory, an individual on the cash receipts and disbursements method of accounting is currently taxable on the economic and financial benefit derived from the absolute right to income in the form of a fund which has been irrevocably set aside for him in trust and is beyond the reach of the payor's debtors. Pulsifer v. Commissioner, 64 T.C. 245, 246 (1975) (citing Sproull v. Commissioner, 16 T.C. 244). In previous cases decided under the economic benefit theory, we have focused on whether a cash method taxpayer had "a vested, rather than contingent, right to future possession of a

---

[53]We have previously acknowledged that, although the constructive-receipt doctrine "significantly differs from the theory of economic benefit * * * [,] the decided cases have not always been models of clarity in respect of the distinction." Anastasio v. Commissioner, 67 T.C. 814, 817 (1977) (fn. ref. omitted), aff'd without published opinion, 573 F.2d 1287 (2d Cir. 1977).

[*86] particular fund." Bizzack Bros. Constr. Corp. v. Commissioner, T.C. Memo. 1980-457, 41 T.C.M. (CCH) 173, 178 (1980) (comparing Stiles v. Commissioner, 69 T.C. 558 (1978), Jacuzzi v. Commissioner, 61 T.C. 262, Sproull v. Commissioner, 16 T.C. 244, and Goldsmith v. United States, 586 F.2d 810 (1978)). Generally, substantial restrictions or conditions imposed on the release of escrowed funds preclude application of the economic benefit theory; in contrast, if a fixed sum of money is irrevocably set aside for a taxpayer's sole benefit and only ministerial duties, not substantial restrictions or conditions, remain until the funds are released, then the economic benefit theory applies. Kuehner v. Commissioner, 214 F.2d 437, 440 (1st Cir. 1954), aff'g 20 T.C. 875 (1953). Compare Stiles v. Commissioner, 69 T.C. 558, and Bizzack Bros. Constr. Corp. v. Commissioner, 41 T.C.M. (CCH) at 176-178, with Sproull v. Commissioner, 16 T.C. at 247 (emphasizing that the irrevocable payment into trust served "to distinguish this case from those in which the exact amount of compensation is subject to some future contingency or subject to the possibility of return"). As we discussed above, SWF's right to the escrowed funds was vested on or before December 31, 2005, after it (1) recorded the easement deed in the Clerk's Office and (2) admitted Virginia Conservation as a partner, because Virginia Conservation could no longer retrieve the funds from the escrow account. We reiterate that the remaining tasks,

[*87] including (1) Virginia Conservation's receipt of the credit transaction number, evidence of recordation of the easement deed, and title report and (2) Mr. Shaw's written authorization to release the escrowed funds, were merely ministerial and did not constitute conditions precedent to SWF's right to the escrowed funds. See Route 231, LLC v. Commissioner, at *56 n.7. Accordingly, we find that on or before December 31, 2005, SWF's proceeds from the VTC transaction were irrevocably set aside for SWF's sole benefit and only ministerial tasks remained before distribution. Consequently, pursuant to the economic benefit theory, we conclude that SWF may be taxed for its 2005 tax year for the economic benefit of the escrowed funds.

Additionally, we note that SWF admitted that the transfer of funds from Virginia Conservation occurred during 2005 under the cash method of accounting. On its 2005 Form 1065, SWF reported that it received $1,802,000 in cash from Virginia Conservation. On the 2005 Schedule K-1 for Virginia Conservation, SWF also reported capital contributed during 2005 of $1,802,000. Petitioner also admits that "[i]n 2005, Virginia Conservation contributed $1,802,000 in cash to SWF in exchange for a partnership interest in SWF." We have held repeatedly that statements made in a tax return signed by a taxpayer are binding and treated as admissions. Mendes v. Commissioner, 121 T.C. 308, 312 (2003) (citing Waring v.

[*88] Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), aff'g T.C. Memo. 1968-126, Lare v. Commissioner, 62 T.C. 739, 750 (1974), aff'd without published opinion, 521 F.2d 1399 (3d Cir. 1975), and Kaltrieder v. Commissioner, 28 T.C. 121, 125-126 (1957), aff'd, 255 F.2d 833 (3d Cir. 1958)).  A taxpayer "cannot * * * disavow * * * [his or her tax] returns without cogent proof that they are incorrect."  Crigler v. Commissioner, T.C. Memo. 2003-93, 85 T.C.M. (CCH) 1091 (2003), aff'd per curiam, 85 Fed. Appx. 328 (4th Cir. 2004).  Petitioner does not argue that the statements on SWF's 2005 Form 1065 are incorrect.[54] Accordingly, we conclude that SWF admitted that the transfer of funds pursuant to the disguised sale, which it characterized erroneously as a capital contribution, occurred during 2005.

----

[54]Without suggesting that SWF's statements on its 2005 Form 1065 are incorrect, petitioner contends that "respondent embraces SWF's capital contribution reporting when he thinks it supports his argument but disregards it when it doesn't."  Petitioner suggests that respondent cannot rely on SWF's tax returns for some representations but dispute it for other representations.  We disagree.  The issue of the characterization of the VTC transaction--i.e., whether it should be treated for Federal income tax purposes as a disguised sale or a capital contribution--is separate from the issue of when to recognize any income from the VTC transaction--i.e., whether the funds transferred by Virginia Conservation to SWF pursuant to the VTC transaction should be included for the 2005 or 2006 tax year.  Accordingly, we conclude that respondent is not precluded from relying on some, but not all, of the representations on SWF's and petitioner's tax returns where their respective representations are not inconsistent.

**[*89]** C.     Conclusion

Upon due consideration of the foregoing, we conclude that (1) the VTC transaction was a disguised sale that occurred during 2005 and (2) SWF had economic benefit of ownership, had taxable receipt, and admitted recognition for Federal income tax purposes of the escrowed funds during 2005. Consequently, the proceeds of the disguised sale are reportable as income to SWF for its 2005 tax year.

V.     Issue 3. Whether Petitioner Overstated the Value of the Easement

On its tax year 2005 Form 1065, SWF reported a charitable contribution of $7,398,333 from the donation of the easement to the Albemarle County PRFA. Respondent contends that SWF overstated the value of the easement on Sherwood Farm and therefore overstated the amount of the deduction allowed pursuant to section 170.

A.     General Legal Background

A taxpayer is entitled to deduct, pursuant to section 170(a), a qualified conservation contribution made within a taxable year.[55]  Sec. 170(c), (f)(3)(B)(iii),

---

[55]Generally, taxpayers are not entitled to deduct gifts of property that consist of less than the taxpayers' entire interest in that property. Sec. 170(f)(3). An exception to this general rule is that taxpayers are permitted to deduct the value of a contribution of a partial interest in property that constitutes a "qualified

(continued...)

**[*90]** (h). Generally, the amount of a charitable contribution is the fair market value of the contributed property at the time it is contributed. Sec. 1.170A-1(a), (c)(1), Income Tax Regs. Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts. Id. para. (c)(2).

In deciding the fair market value of property, we must take into account not only the current use of the property but also its highest and best use. See Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986); sec. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs. A property's highest and best use is the highest and most profitable use for which it is adaptable and needed or likely to be needed in the reasonably near future. Olson v. United States, 292 U.S. 246, 255

---

[55](...continued)
conservation contribution" as defined in sec. 170(h)(1). Sec. 170(f)(3)(B)(iii). For a contribution to constitute a qualified conservation contribution, the taxpayer must show that the contribution is (1) of a "qualified real property interest", (2) to a "qualified organization", and (3) "exclusively for conservation purposes." Sec. 170(h)(1). For the donation to be deductible, the conservation purpose must be protected in perpetuity. Sec. 170(h)(5); sec. 1.170A-14(a), Income Tax Regs. In the instant case, respondent does not challenge the validity of the easement or whether SWF is entitled to a charitable contribution deduction pursuant to sec. 170 for the contribution of the easement to the Albemarle County PRFA. Respondent challenges only petitioner's valuation of the easement and, therefore, the amount of the charitable contribution deduction allowed pursuant to sec. 170.

[*91] (1934).  The highest and best use can be any realistic, objective potential use of the property.  Symington v. Commissioner, 87 T.C. 892, 896 (1986).  If different from the current use, a proposed highest and best use requires "closeness in time" and "reasonable probability".  Hilborn v. Commissioner, 85 T.C. 677, 689 (1985).  Under circumstances where there is a substantial record of sales of easements comparable to a donated easement, the fair market value of the donated easement is based on the sale prices of those comparable easements.  Sec. 1.170A-14(h)(3)(i), Income Tax Regs.  Where, as in the instant case, there is no established market for similar conservation easements and no record exists of sales of such easements, the regulations provide another method to determine fair market value:

> If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction. * * *

Id.  We have used a "before and after" methodology in evaluating conservation easements.  See, e.g., Hilborn v. Commissioner, 85 T.C. 677; Butler v. Commissioner, T.C. Memo. 2012-72;  Simmons v. Commissioner, T.C. Memo. 2009-208, aff'd, 646 F.3d 6 (D.C. Cir. 2011); Kiva Dunes Conservation, L.L.C. v.

[*92] Commissioner, T.C. Memo. 2009-145; Griffin v. Commissioner, T.C. Memo. 1989-130, aff'd, 911 F.2d 1124 (5th Cir. 1990).  The parties in the instant case agree that the before and after methodology is the appropriate valuation method to determine the fair market value of the easement.

Additionally, when using the before and after valuation approach, any enhancement in the value of a donor's other property resulting from the easement contribution, or of property owned by certain related persons, reduces the value of the contribution deduction.  Sec. 1.170A-14(h)(3)(i), Income Tax Regs.

Valuation is not a precise science, and the fair market value of property on a given date is a question of fact to be resolved on the basis of the entire record.  See, e.g., Kaplan v. Commissioner, 43 T.C. 663, 665 (1965); Arbini v. Commissioner, T.C. Memo. 2001-141.  In the instant case, each party has offered the report and testimony of an expert witness to establish the value of the easement for purposes of arriving at the proper amount of the charitable contribution deduction.  An expert's opinion is admissible if it assists the trier of fact to understand the evidence or to determine a fact in issue.  Fed. R. Evid. 702.  We evaluate expert opinions in the light of the expert's demonstrated qualifications and all other evidence in the record.  See Parker v. Commissioner, 86 T.C. 547, 561 (1986).  Where experts offer competing estimates of fair market value, we

[*93] decide how to weigh those estimates by, inter alia, examining the factors they considered in reaching their conclusions.  See Casey v. Commissioner, 38 T.C. 357, 381 (1962).  We are not bound by the opinion of any expert witness, and we may accept or reject expert testimony in the exercise of our sound judgment. Helvering v. Nat'l Grocery Co., 304 U.S. 282 (1938);  Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990).  We may also reach a decision as to the value of property that is based on our own examination of the evidence in the record.  Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), aff'g T.C. Memo. 1974-285.

Generally, deductions are a matter of legislative grace and a taxpayer bears the burden of proving entitlement to any claimed deductions.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  Moreover, the Commissioner's determination of value is normally presumed correct, and the taxpayer bears the burden of proving that the determination is incorrect.  See Rule 142(a); Welch v. Helvering, 290 U.S. at 115; Schwab v. Commissioner, T.C. Memo. 1994-232. However, as we stated above, the allocation of the burden of proof is immaterial in the instant case because we decide this factual issue on the preponderance of the evidence.  See Knudsen v. Commissioner, 131 T.C. at 189; Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

**[\*94]** B.     Parties' Experts and Bases for Valuation

Respondent offered an expert report drafted by Karen D. Pape (Pape report). Ms. Pape has worked with Albemarle County real estate since 1979 and has valued over 100 conservation easements, many of which were in Albemarle County. Ms. Pape appraised several properties that petitioner's expert used as comparable properties in his valuation.

Petitioner offered an expert report drafted by Brian Jones (Jones report). Mr. Jones has appraised more than 70 easements in Albemarle County since 2001 and has appraised over 600 easement throughout Virginia during his career. Respondent contends that Mr. Jones was heavily influenced by Mr. Williams' appraisal, which was completed during December 2005, before beginning his own valuation and therefore that Mr. Jones' independence may have been compromised and that the Jones report was not credible. Respondent's contention is based on only two facts: (1) Mr. Jones was given Mr. Williams' appraisal before compiling the Jones report and (2) there was a difference of less than 1% between the two appraisals as to the ultimate value of the easement. We disagree with respondent. Respondent mistakenly presumes impropriety without proving it, i.e., that Mr. Jones must have been improperly influenced by Mr. Williams' appraisal because he had access to it and because their ultimate results were similar. As petitioner

[*95] points out, Mr. Jones used different valuation methods and different comparable properties, applied different amounts of adjustments, and determined different values for Sherwood Farm before and after the easement. Moreover, Mr. Jones credibly testified that he referred to Mr. Williams' appraisal only for its description of Sherwood Farm as of December 2005. Accordingly, we conclude that Mr. Jones was not improperly influenced by Mr. Williams' appraisal.

The Pape report and the Jones report (collectively, reports) agreed on many aspects of the bases for valuing the easement. The reports relied on Roger Ray's development plan for Sherwood Farm, which determined that 38 separate lots could be developed at the site. Both reports determined that the highest and best use for Sherwood Farm before the easement was for residential housing development into estate type lots. Both reports also determined that the easement on Sherwood Farm was very restrictive because it precluded the division of over 674.65 acres of land or the development of more than 5 dwellings on the site, limited modification or construction of some of the existing structures and improvements, and prohibited most industrial or commercial uses for Sherwood Farm; therefore, both reports determined that the highest and best use for Sherwood Farm after the easement was for agricultural or recreational use.

**[\*96]** Moreover, both experts used primarily the comparable sales method to determine the values of Sherwood Farm before and after the easement.[56] An appraiser may use the comparable sales method, or another accepted method, to estimate the before and after values of the property. Hilborn v. Commissioner, 85 T.C. at 689. An appraiser using the comparable sales method, also known as the market-data approach or the sales comparison approach, finds sales of properties that meet three criteria: (1) the properties themselves are similar to the subject property; (2) the sales are arm's-length transactions; and (3) the sales have occurred within a reasonable time of the valuation date. Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19 (1979). Because no two sales and no two properties are ever identical, the appraiser then considers aspects of the sales of comparable properties such as time, size, or other significant features and makes appropriate adjustments for each to approximate the qualities of the subject

---

[56]Both reports used additional valuation methods to verify the conclusions reached from the comparable sales method. Ms. Pape used the development approach to test the reasonableness of her valuation of Sherwood Farm before the easement and the matched pair analysis to test the reasonableness of her valuation of Sherwood Farm after the easement. Mr. Jones also used the development approach to test the reasonableness of his valuation of Sherwood Farm before the easement. Both parties contend that the alternative methods of valuation were less reliable and/or less reasonable than the comparable sales method. We agree and, therefore, we do not discuss further the reports' conclusions under the alternative methods.

**[\*97]** property.  <u>Estate of Spruill v. Commissioner</u>, 88 T.C. 1197, 1229 n.24 (1987); <u>Wolfsen Land & Cattle Co. v. Commissioner</u>, 72 T.C. at 19.  Although the comparable sales method, like all valuation techniques, is far from an exact science, <u>see</u> <u>Wolfsen Land & Cattle Co. v. Commissioner</u>, 72 T.C. at 19, we have found the comparable sales approach to be the most reliable indicator of value when there is sufficient data about sales of properties similar to the subject property, <u>see, e.g.</u>, <u>Estate of Spruill v. Commissioner</u>, 88 T.C. at 1229 n.24; <u>Estate of Rabe v. Commissioner</u>, T.C. Memo. 1975-26, <u>aff'd without published opinion</u>, 566 F.2d 1183 (9th Cir. 1977).

Despite the similar bases for valuation, respondent contends that the Jones report is not credible because it fails to comply with the requirements of the Uniform Standards of Professional Appraisal Practice (USPAP).[57]  Specifically, respondent contends that petitioner failed to list the proper hypothetical conditions

---

[57]Uniform Standards of Professional Appraisal Practice (USPAP) are promulgated by the Appraisal Standards Board of the Appraisal Foundation, a nonprofit organization comprising other nonprofit organizations that represent appraisers and users of appraisal services.  <u>Whitehouse Hotel Ltd. P'ship v. Commissioner</u>, 131 T.C. 112, 126 n.4 (2008) (citing The Appraisal Foundation, Frequently Asked Questions:  http://www.appraisalfoundation.org/s _appraisal/doc.asp?CID=9 & DID=172 (last visited Oct. 25, 2008)), <u>rev'd on other grounds</u>, 615 F.3d 321 (5th Cir. 2010).  USPAP is widely recognized and accepted as containing standards applicable to the appraisal profession.  <u>Id.</u> at 127.  Adherence to those standards is evidence that the appraiser is applying methods that are generally accepted within the appraisal profession.  <u>Id.</u>

**[\*98]** of an appraisal completed after an easement is placed on property and that petitioner failed to list several details required for self-contained appraisal reports. We disagree. We have previously held that "[f]ull compliance with professional standards [e.g., USPAP] is not the sole measure of an expert's reliability" and that "a noncompliant valuation report is not per se unreliable." Whitehouse Hotel Ltd. P'ship v. Commissioner, 131 T.C. 112, 127 (2008), rev'd on other grounds, 615 F.3d 321 (5th Cir. 2010); see also Schwartz v. Commissioner, 348 Fed. Appx. 806, 809 (3d Cir. 2009), aff'g T.C. Memo. 2008-117. In the instant case, we decline to accept the merits of respondent's contentions because, as petitioner notes, respondent has not demonstrated how the alleged technical errors render the Jones report unreliable or that the alleged technical errors are reflective of more significant substantive errors. Accordingly, we decline to find that the Jones report is unreliable solely for any alleged failures to comply with USPAP requirements. Instead, we independently review both reports to evaluate the reliability of each and determine the proper valuation of the easement.

**[*99]** C.    The Pape Report

  1.    The Pape Report's Valuation of Sherwood Farm Before the Easement

The Pape report reviewed sales of the following five properties to ascertain the value of Sherwood Farm before the easement:  Mint Meadow, Ragged Mountain, Montalto,[58] Catterton, and Sutherland.  The Pape report listed eight adjustment factors for determining the before-easement values:  condition of sale, significant buildings, market conditions, topography, location, size, views, and other improvements.

Ms. Pape adjusted the property value for each sale that occurred over six months before the date of the valuation, i.e., Mint Meadow, Ragged Mountain, and Montalto, by 10% per annum on account of improved market conditions.  Ms. Pape adjusted downward the values of Ragged Mountain and Sutherland for buildings or other improvements; although Montalto also had buildings, no adjustments were made.  Ms. Pape determined that Ragged Mountain and Montalto had significant slope issues and were inferior to Sherwood Farm, and adjusted each of those values upward.  Ms. Pape also determined that Mint Meadow, Ragged Mountain, and Montalto were in areas superior to Sherwood

---

[58]Petitioner refers to the Montalto property as "Brown's Mountain".  To avoid confusion and for convenience, we refer to it only as "Montalto".

**[*100]** Farm and therefore adjusted their values downward 20%, 15%, and 25%, respectively. Mint Meadow, Montalto, and Catterton were also deemed to be smaller parcels that were more valuable, so their values were adjusted downward on account of size. Ms. Pape adjusted downward the values of Mint Meadow, Ragged Mountain, Montalto, and Catterton for their views, which she deemed to be superior to those present at Sherwood Farm. Because Ms. Pape believed that there were nonmarket motivations that influenced the sale of the Montalto property, she made an additional 20% downward adjustment to its value for the unique sale condition.

In the aggregate, Ms. Pape determined the following values for each of her before-easement comparable properties:

| | Mint Meadow | Ragged Mountain | Montalto | Catterton | Sutherland |
|---|---|---|---|---|---|
| Total sale price | $4,100,000 | $8,000,000 | $15,000,000 | $4,100,000 | $6,400,000 |
| Price per acre | $18,865 | $15,549 | $45,587 | $16,400 | $13,949 |
| Downward adjustments | Location, size, views | Improvement, location, views | Sale condition, location, size, view | Size, views | Improvements |
| Upward adjustments | Market | Market, topography | Market, topography | None | None |
| Adjusted price per acre | $14,715 | $13,579 | $19,146 | $13,120 | $13,404 |

After reviewing the adjusted prices per acre, Ms. Pape discounted the Montalto valuation altogether because it was "an outlier as it was a very unique property

[*101] with a singularly distinguished location, an incredible view[,] and a neighboring property owner with a great motivation." Ms. Pape then used the remaining values to determine a $13,500 per acre value to be applied to the 674.65 acres of Sherwood Farm. The Pape report concluded that the value of Sherwood Farm before the easement was $9,100,000.[59]

### 2. The Pape Report's Valuation of Sherwood Farm After the Easement

The Pape report reviewed sales of the following four properties to ascertain the value of Sherwood Farm after the easement: Plank Road, Decca Lane, Lone Oak Farm, and Ballards Mill. Each of the properties was subject to an easement or other limitation on development potential. The Pape report listed seven adjustment factors for determining the after-easement values: market conditions, topography, location, size, development potential, improvements, and flora.[60]

Similar to her adjustments for the before-easement comparable sales, Ms. Pape adjusted the property value for each sale that occurred over six months before the date of the valuation, i.e., Plank Road, Lone Oak Farm, and Ballards

---

[59]As rounded in the Pape report.

[60]According to the Pape report, it seems that Ms. Pape considered, but did not implement, adjustments on account of views from the properties to the values of the four after-easement comparable sales.

[*102] Mill, by 10% per annum on account of improved market conditions. In the explanation section, the Pape report claims to make a 20% adjustment upward to the value of Lone Oak Farm for topography because of substantial wetlands on the property; however, the calculation section included a 30% adjustment upward for topography on that property. Ms. Pape determined that Decca Lane and Ballards Mill were in areas superior to Sherwood Farm and therefore adjusted their values downward by 10% and 20%, respectively. In contrast, she adjusted upward by 25% the value of Lone Oak Farm because she determined it to be in a location inferior to that of Sherwood Farm. The Pape report adjusted the value of each of the four properties on account of size; the values of Plank Road, Decca Lane, and Ballards Mill were adjusted downward because they were smaller tracts of land and the value of Lone Oak Farm was adjusted upward significantly as it was a larger tract of land. Ms. Pape also adjusted downward the value of Lone Oak Farm by 10% for its building improvements and by another 10% because its easement allowed division of parcels about 100 acres in size. Ms. Pape determined that Decca Lane and Ballards Mill were primarily wooded properties that had inferior flora and, therefore, she adjusted the value of each upward by 10%.

[*103] In the aggregate, Ms. Pape determined the following values for her after-easement comparable properties:

|  | Plank Road | Decca Lane | Lone Oak Farm | Ballards Mill |
|---|---|---|---|---|
| Total sale price | $1,900,000 | $1,175,000 | $4,000,000 | $1,792,700 |
| Price per acre | $6,234 | $9,779 | $3,026 | $9,141 |
| Downward adjustments | Size | Location, size | Development potential, improvements | Location, size |
| Upward adjustments | Market | Flora | Market, topography, location, size | Market, flora |
| Adj. Price Per acre | $6,733 | $7,823 | $6,344 | $7,827 |

Ms. Pape used the four values to determine a $7,500 per acre value to be applied to the 674.65 acres of Sherwood Farm. The Pape report concluded that the value of Sherwood Farm after the easement, after rounding, was $5,060,000. The Pape report subtracted this amount from the $9,100,000 before-easement value of Sherwood Farm and concluded that the value of the easement was $4,040,000.

D.    The Jones Report

1.    The Jones Report's Valuation of Sherwood Farm Before the Easement

The Jones report reviewed sales of the following six properties to ascertain the value of Sherwood Farm before the easement:  Blenheim Road, Kluge

[*104] Estate,[61] Airslie Farm, Castle Hill, Chapel Springs, and Bundoran. The Jones report considered the following adjustment factors for determining the before-easement values: condition of sale, market condition, location, size, and flood plain.[62] Rather than make adjustments for buildings and/or improvements, the Jones report determined sale prices net of any improvements existing on the land.

Mr. Jones adjusted the property value for each sale that occurred over six months before the date of the valuation, i.e., Kluge Estate, Castle Hill, and Chapel Springs, by 12% per annum on account of improved market conditions. Although the Blenheim Road property was sold during December 2006, more than six months from the date of Mr. Jones' valuation, Mr. Jones determined no adjustment was necessary because of offsetting fluctuations in the market.[63] Mr. Jones

---

[61]Respondent refers to the Kluge Estate property as "Carter's". To avoid confusion and for convenience, we refer to it only as "Kluge Estate".

[62]Mr. Jones also considered adjustments for financing and for frontage/access but determined that no adjustments were necessary for either of those two factors.

[63]Respondent contends that Mr. Jones erred by failing to adjust the value of Blenheim Road to account for market conditions and that Blenheim Road was not a proper comparable. Petitioner contends that Mr. Jones accurately determined that there were offsetting fluctuations in the market and therefore no adjustments were necessary on account of market condition. We agree with petitioner and,

(continued...)

[*105] adjusted downward the Airslie Farm and Castle Hill values by $2,600 each for superior location. Mr. Jones determined that Blenheim Road, Kluge Estate, and Airslie Farm were similar in size to Sherwood Farm and their values needed no adjustments; in contrast, Mr. Jones determined that Castle Hill, Chapel Springs, and Bundoran were larger properties and adjusted each property's value upward by $5,200 per acre. Blenheim Road's value was also adjusted upward by $3,000 per acre to account for a flood plain on approximately 27% of the Blenheim Road property. Kluge Estate's value was adjusted upward 5% to account for a bought-out contract situation. Bundoran's value was adjusted downward 10% for a sale condition.[64]

---

[63](...continued)
because it is "appropriate to consider sales of propert[y] occurring subsequent to the valuation date if the properties involved are indeed comparable to the subject properties", see Estate of Thompson v. Commissioner, 89 T.C. 619, 628-629 n.7 (1987), rev'd on other grounds, 864 F.2d 1128 (4th Cir. 1989), we conclude that Blenheim Road was an acceptable comparable property.

[64]Respondent contends that the Bundoran comparable property sale was unreliable because Mr. Jones adjusted the property's value for a condition of sale that he did not explain. We disagree. As petitioner contends, Mr. Jones explained both in the Jones report and at trial that the condition of sale adjustment was made to account for improvements to a life estate that did not add value. Accordingly, we conclude that Bundoran was a reliable comparable property. Moreover, we note that respondent's contention, if we accepted it, would have the effect of increasing the value of the Bundoran comparable property and, therefore, increasing the before-easement value of Sherwood Farm and the value of the

(continued...)

**[\*106]** In the aggregate, Mr. Jones determined the following values for each of his before-easement comparable properties:

| | Blenheim Road | Kluge Estate | Airslie Farm | Castle Hill | Chapel Springs | Bundoran |
|---|---|---|---|---|---|---|
| Total sale price[1] | $3,500,000 | $8,000,000 | $10,000,000 | $21,000,000 | $17,500,000 | $30,300,000 |
| Price per acre | $11,788 | $13,691 | $19,609 | $13,271 | $10,784 | $12,806 |
| Downward adjustments | None | None | Location | Location | None | Sale condition |
| Upward adjustments | Flood Plain | Sale condition, market | None | Market, size | Market, size | Size |
| Adjusted price per acre | $14,788 | $16,963 | $17,009 | $16,668 | $16,955 | $16,726 |

[1] Total sale price is calculated net of improvements on the property.

Mr. Jones determined that the "six sales ranged in value from $14,788 to $17,009 per acre with an average $16,518, a mean of $15,899 per acre with a standard deviation of $370 per acre." Mr. Jones then determined a $15,500 per acre value to be applied to the 674.65 acres of Sherwood Farm. The Jones report concluded that the value of Sherwood Farm before the easement was $10,460,000.[65]

[64](...continued)
easement itself.

[65] As rounded in the Jones report.

**[*107]**    2.    <u>The Jones Report's Valuation of Sherwood Farm After the Easement</u>

The Jones report reviewed sales of the following five properties to ascertain the value of Sherwood Farm after the easement: Greenmont Farm, Route 612, Monrovia Road, Lone Oak Farm, and East Belmont. Four of the properties were subject to an easement or other limitation on development potential. Mr. Jones considered six adjustment factors for determining the after easement values: financing, market conditions, location/access, frontage, size/acres, and development potential. Similar to the comparable properties for the before-easement value, the Jones report determined sale prices net of any improvements existing on the land.

Similar to his adjustments for the before-easement comparable properties, Mr. Jones adjusted the values of three of the four properties whose sales occurred over six months before the date of the valuation, i.e., Route 612, Lone Oak Farm, and East Belmont, by 12% per annum on account of improved market conditions.[66]

---

[66]Respondent contends that Mr. Jones erred by not adjusting the value of Greenmont Farm, which was sold during June 2006, on account of market conditions. However, as petitioner notes, both parties adjusted values for market conditions only when the sale occurred <u>over</u> six months from the date of the easement. Accordingly, because the sale of Greenmont Farm occurred within six months of the date of the easement, we conclude that no adjustment was necessary for market conditions.

[*108] The Jones report adjusted downward the values of Route 612 and East Belmont on account of superior location and adjusted upward the value of Lone Oak Farm on account of inferior location. Mr. Jones made adjustments for four of the five properties on account of size; the values of Greenmont Farm and Route 612 were adjusted downward because of their smaller sizes and the values of Lone Oak Farm and East Belmont were adjusted upward because of their larger sizes. Mr. Jones also adjusted the value of Greenmont Farm downward by $3,000 per acre because he determined that the easement on Greenmont Farm was less restrictive than the easement on Sherwood Farm. Although Mr. Jones considered potential adjustments for financing and frontage, no adjustments were made for any of the five properties on account of either of these considerations.

In the aggregate, Mr. Jones determined the following values for each of his after-easement comparable properties:

| [*109] | Greenmont Farm | Route 612 | Monrovia Road | Lone Oak Farm | East Belmont |
|---|---|---|---|---|---|
| Total sale price[1] | $2,300,000 | $3,000,000 | $3,000,000 | $3,500,000 | $11,300,000 |
| Price per acre | $8,337 | $10,639 | $4,371 | $2,531 | $8,964 |
| Downward adjustments | Size, development potential | Location, size | None | None | Location |
| Upward adjustments | None | Market | None | Market, location, size | Market, size |
| Adjusted price per acre | $4,537 | $4,634 | $4,371 | $4,536 | $4,602 |

[1]Total Sale Price is calculated net of improvements on the property.

Mr. Jones determined that the "average of all five sales was $4,536, while the median was $4,537 with a standard deviation of $678 per acre." Mr. Jones then determined a $4,500 per acre value to be applied to the 674.65 acres of Sherwood Farm. The Jones report concluded that the value of Sherwood Farm after the easement was $3,040,000 after rounding.

### 3. The Jones Report's Enhancement Adjustment

The Jones report also determined that Mr. Lewis owned an additional 65.9-acre property near Sherwood Farm that was not covered by the easement. Pursuant to section 1.170A-14(h)(3)(i), Income Tax Regs., Mr. Jones determined that an adjustment was necessary to the value of the easement to account for the potential value enhancement to Mr. Lewis' nearby property. Using the comparison analysis, Mr. Jones determined that an adjustment of approximately

**[*110]** $70,000 was appropriate to account for the enhancement in value to Mr. Lewis's nearby property. Therefore, the Jones report concluded that the value of the easement was $7,350,000, i.e., the $10,460,000 before-Easement value less the aggregate of (1) the $3,040,000 after-easement value and (2) the $70,000 enhancement adjustment.

E.    Analysis of the Reports

As we stated above, the reports agreed on many aspects of the bases for valuing the easement. Both reports relied on Roger Ray's development plan for Sherwood Farm, agreed on the highest and best uses for Sherwood Farm both before and after the easement, concluded that the easement on Sherwood Farm was very restrictive, and used primarily the comparable sales method. However, the reports differed in a number of ways.

1.    Market Conditions

The reports applied different rates of adjustment to account for the market conditions at the time of the easement. The Pape report adjusted comparable property sales prices by 10% per annum to account for changes in market conditions, but did not provide any support for the 10% rate. The Jones report adjusted comparable property sales prices by 12% per annum to account for changes in market conditions; Mr. Jones based this rate on a price index released

**[\*111]** by the Office of Federal Housing Enterprise Oversight stating that home prices increased nearly 13% from the end of 2004 to the end of 2005. Moreover, the 12% per annum rate comports with credible testimony from Mr. Jones and Mr. Lewis regarding the rising real estate market in and around Albemarle County during the end of 2005. Because of great demand and pressure to develop large farm lands into subdivisions, real estate prices in Albemarle County were high and increasing rapidly. Accordingly, we conclude that the Jones report used a more accurate rate of adjustment for market conditions and therefore more accurately adjusted the values of comparable properties than the Pape report to account for improving market conditions.

### 2. Features of the Comparable Properties

The reports used different comparable properties to determine the values of Sherwood Farm before and after the easement. Mr. Jones used 11 comparable properties: 6 for his before-easement valuation and 5 for his after-easement valuation. Because she ultimately determined that one of her properties was an "outlier", Ms. Pape used only four comparable properties for her before-Easement valuation and another four properties for her after-easement valuation.

The Jones report included before-easement and after-easement comparable properties that were closer to Sherwood Farm than those used in the Pape report.

[*112] For before-easement comparables Mr. Jones used two properties, i.e., Blenheim Road and Kluge Estate, in the immediate vicinity of Sherwood Farm while Ms. Pape ultimately discounted the property, i.e., Montalto, that was closest to Sherwood Farm. For after-easement comparables, other than Lone Oak Farm, which both experts used, Mr. Jones used three properties, i.e., Greenmont Farm, Route 612, and East Blemont, that were closer to Sherwood Farm than any of the comparable properties Ms. Pape used.

Mr. Jones also found comparable properties that formed a range of properties smaller and larger than Sherwood Farm. For his before-easement comparable properties, three were smaller than Sherwood Farm and three were larger; for his after-easement comparable properties, two were smaller than Sherwood Farm, one was of a nearly identical size, and two were larger. On the other hand, all four of the before-easement properties that Ms. Pape ultimately used were smaller than Sherwood Farm, and three out of the four after-easement properties were smaller than Sherwood Farm; the only one larger than Sherwood Farm was Lone Oak Farm, which Mr. Jones also used as a comparable property.

Each report also used before-easement comparable properties that differed with respect to topography. The Jones report generally used before-easement comparable properties with gentle rolling topography, open farm land, and

[*113] negligible slopes that matched the topography of Sherwood Farm. Of the six before-easement comparable properties used by the Jones report, only one, i.e., Blenheim Road, had topography adjustments on account of significant areas of floodplains.[67] On the other hand, many of Ms. Pape's before-easement comparable properties had topography issues. Of the five properties originally considered by the Pape report, two, i.e., Ragged Mountain and Montalto, had topography issues that were significant enough for Ms. Pape to adjust the value of the property and, as petitioner contends, another two, i.e., Catterton and Sutherland, may have also had significant floodplain and slope issues that Ms. Pape failed to consider.

The Jones report also used a greater number of comparable properties that were sold within a year of the date of the easement. Five out of the six before-easement comparable properties and four out of the five after-easement comparable properties in the Jones report were sold within a year of the easement. In contrast, only two out of the four before-easement comparable properties and

_____

[67]Respondent contends that Mr. Jones failed to appropriately adjust for the effect of the floodplain on the value of the Lone Oak Farm. Petitioner contends that in Albemarle County topography issues are less significant for Lone Oak Farm and other after-easement properties, where the highest and best use of the land is agricultural, than with before-easement properties, where the highest and best use is residential housing development, because they limit the number of usable lots to be developed. We agree with petitioner.

[*114] one out of the four after-easement comparable properties ultimately used by the Pape report were sold within a year of the easement. The sale of Montalto, the before-easement comparable property that Ms. Pape ultimately discounted as an outlier, also did not occur within a year of the easement.

After reviewing each of the reports, we find that Mr. Jones selected comparable properties with location, size, topography, and timing features that were generally more comparable to those of Sherwood Farm and the easement.

Accordingly, we conclude that the Jones report chose better comparable properties than the Pape report.

### 3. Adjustments to the Comparable Properties

The reports also differed in the types of adjustments and the method of adjusting the values of the comparable properties.

The Pape report included a number of errors that cause us to question its overall reliability. For example, the report incorrectly stated that Lone Oak Farm, one of the after-easement comparable properties, was approximately 1,392 acres and then calculated the price per acre using 1,322 acres. Lone Oak Farm was, in fact, approximately 1,382 acres. As a second example, Ms. Pape incorrectly claimed in the Pape report that Plank Road, one of her after-easement comparable properties, could not be further divided. However, after examining the property

[*115] itself, Ms. Pape discovered that Plank Road had in fact been subdivided into 21-acre lots. Nonetheless, Ms. Pape used Plank Road, which had been subdivided and developed, as a property comparable to Sherwood Farm after the easement, which could not be developed to the same degree. A third example is Ms. Pape's 10% upward adjustment to the value of Ballards Mill on account of inferior flora; Ms. Pape admitted at trial that she "absolutely did make a mistake on that". Ms. Pape also committed two errors with respect to the Catterton property. She failed to consider the implications of a 150-acre tract that was part of the property when she was computing and adjusting her valuation of Catterton. Additionally, she inappropriately relied on photographs provided by a real estate agent to adjust the value of the property by 10% for views that she determined were superior to those present on Sherwood Farm even though she did not observe any such views during her own visit to the Catterton property. In contrast, we did not note any significant material errors during our review of the Jones report.

Additionally, Ms. Pape failed to evaluate other significant considerations altogether. For example, she failed to fully investigate the motivations of the parties behind the sale Ballards Mill, which was one of her after-easement comparable properties. At trial she admitted that (1) the Ballards Mill sale had not been publicly listed, (2) the acquirer of Ballards Mill owned an adjoining property

**[*116]** and may have been willing to pay a premium to assemble a larger tract of land, and (3) she failed to consider these facts when computing the value to assign to the Ballards Mill property. The Pape report also concluded that the easement did not cause any enhancement of contiguous properties. In contrast, the Jones report noted neighboring properties owned by Mr. Lewis and adjusted downward the ultimate value of the easement as a result of enhancements to those neighboring properties. Because of these glaring omissions, we lack confidence in Ms. Pape's adjustments to her comparable property values.

When Ms. Pape adjusted the values of her comparable properties to account for feature variations from Sherwood Farms, those adjustments were inconsistent in application or degree. With respect to location adjustments, Ms. Pape adjusted downward the value of the Decca Lane property, which was in one of the most prestigious locations in Albemarle County, by only 10% even though she adjusted the values of Mint Meadow and Ragged Mountain by 20% and 15%, respectively. Ms. Pape explained this inconsistency by stating that the location adjustment was less significant when evaluating after-easement properties because of the limited development potential. However, Ms. Pape's largest adjustment, i.e., 50% upward, was made to an after-easement comparable property, Lone Oak Farm, because she determined the property's lot size to be inferior to that of Sherwood

[*117] Farm. With respect to topography adjustments, Ms. Pape adjusted the value of Lone Oak Farm upward by 30%[68] even though only 16% of the property was covered by wetlands and the remaining 84% was available for farming, the main use of the restricted property. In contrast, she adjusted the value of Ragged Mountain upward by only 10% even though 33%-50% of the property was covered by critical slopes that limited development and made no adjustment to the value of Sutherland despite significant floodplains on its property. Ms. Pape's lack of proper adjustments is even less explicable when we consider that both Ragged Mountain and Sutherland were before-easement comparable properties whose development potential and ultimate values would be more diminished by topography issues than would those of Lone Oak Farm, which was primarily farming land. With respect to views adjustments, Ms. Pape admitted at trial that she mistakenly failed to adjust the value of Ballards Mill for having the "best [view she's] * * * seen" even though she adjusted the values of four other properties on account of views.

Respondent contends that Mr. Jones also made inconsistent adjustments in the Jones report with respect to the sizes of some of his comparable properties. In

---

[68]Although Ms. Pape claimed in the description of the adjustments to adjust the value upward by 20%, her table of calculations indicates that she ultimately adjusted the value upward by 30%.

[*118] particular, respondent contends that Mr. Jones failed to adjust the value of Blenheim Road downward even though he adjusted the value of Route 612 and Greenmont Farm downward and the three properties are roughly similar in size. We disagree. As petitioner contends, Mr. Jones properly determined that for purposes of the before-easement valuation analysis Blenheim Road would be included in the same size category as Sherwood Farm because both had similar development potential. However, for purposes of the after-easement analysis, a size adjustment was necessary because there was a significant difference between the marketability of Sherwood Farm, which was a 674.65-acre tract of land that could be used only for farming, and the much smaller Route 612 and Greenmont Farm properties, which could possibly be sold to estate home-buyers. Accordingly, we find no inconsistency in Mr. Jones' adjustments.

After reviewing both reports, we conclude that the Pape report contained numerous errors, omissions, and inconsistencies, while the Jones report generally avoided them.

### 4. Effect of Improvements

Respondent's main contention is that the Jones report lacks reliability because it used multiple comparable properties with significant buildings and other improvements. In particular, respondent contends that (1) before-easement

**[*119]** comparable properties with buildings and improvements do not have the same highest and best use as those with predominantly unobstructed land and (2) Mr. Jones undervalued the improvements to his before-easement comparable properties and overvalued the improvements on his after-easement comparable properties to artificially increase the value of the easement. We disagree.

As a preliminary consideration, we note that while respondent is correct that many of Mr. Jones' comparable properties had improvements, Sherwood Farm also had buildings and improvements, including a primary dwelling that was renovated in 1979, barns, sheds, an ice house, an old school, and two old tenant houses. Moreover, four out of the nine comparable properties originally used by respondent's expert, Ms. Pape, included improvements and buildings. Accordingly, because Sherwood Farm had buildings and improvements and respondent's own expert used comparable properties with improvements, we question the merits of respondent's contention that comparable properties that are free of any improvements or buildings are more reliable than those having improvements.

Moreover, at trial Mr. Jones credibly testified that most developers would remove most buildings and other improvements because they value vacant land for development. Therefore, he assigned value to improvements on the before-

[*120] easement comparable properties only if a developer might find them of use or value to the proposed development. Respondent's expert, Ms. Pape, confirmed Mr. Jones' testimony by stating that improvements on the land are sometimes razed or demolished and that in those cases no value should be assigned to the improvements. Accordingly, we find that Mr. Jones properly used before-easement comparable properties with improvements and accurately adjusted the values of those properties to account for the improvements.

Respondent's contention that Mr. Jones undervalued the improvements to his before-easement comparable properties and overvalued the improvements on his after-easement comparable properties is based on a comparison of values assigned by Mr. Jones to those assessed by the county. However, "[w]e do not consider that the amount for which * * * property was assessed for purposes of local taxation * * * [to be] necessarily a reliable criterion to be used in estimating its fair market value." Frazee v. Commissioner, 98 T.C. 554, 563 (1992) (quoting Lippincott v. Commissioner, 27 B.T.A. 735, 740 (1933), rev'd, 72 F.2d 788 (3d Cir. 1934)). In Estate of Bennett, we confronted the issue of using assessments from counties in Virginia as indicators of fair market value and stated:

> "While we recognize that assessed values may be 'considered' as an indicator of fair market value, assessed values are relevant only when the relationship between assessed value and fair market value is

**[\*121]** demonstrated. Section 25.2512-1, Gift Tax Regs. Moreover, even if such relationship is demonstrated, assessed values generally are used 'basically as a corroboration of fair market value determined by a more reliable method.'"

Estate of Bennett v. Commissioner, T.C. Memo. 1989-681, 58 T.C.M. (CCH) 1056, 1065 (quoting N. Trust Co. v. Commissioner, 87 T.C. 349, 382 (1986), aff'd on another issue sub nom. Citizens Bank & Trust Co. v. Commissioner, 839 F.2d 1249 (7th Cir. 1988)) (citing Emmet v. Commissioner, 11 T.C. 90, 95 (1948), and Estate of Frieders v. Commissioner, T.C. Memo. 1980-184, aff'd, 687 F.2d 224 (7th Cir. 1982)), aff'd without published opinion, 935 F.2d 1285 (4th Cir. 1991). Although we noted that "Virginia law provides that assessed value is intended to represent 100 percent of fair market value", we determined that "[t]he weight of the evidence * * * suggest[ed] that the * * * County assessments, taken in isolation, were NOT reliable indicators of the fair market value of individual parcels of property." Id., 58 T.C.M. (CCH) at 1065. In the instant case, the comparable properties used by both Ms. Pape and Mr. Jones were consistently sold for amounts in excess of the values assessed by the county. Accordingly, we conclude that the county assessments of the improvements on the comparable properties used in the reports are not reliable indicators of their fair market value. Respondent's contention is further undermined by a comparison of each expert's

**[\*122]** treatment of Lone Oak Farm, which was the one after-easement comparable property that both Mr. Jones and Ms. Pape used. Ms. Pape's value for the improvements on the land was $100,000 greater than the value attributed by Mr. Jones, discrediting respondent's contention that Mr. Jones overvalued the improvements. Accordingly, we conclude that respondent's contention that Mr. Jones undervalued the improvements to his before-easement comparable properties and overvalued the improvements on his after-easement comparable sale properties to be meritless.

F.     Conclusion

The Jones report properly accounted for the restrictive nature of the easement and the market conditions at the time of the easement; used more numerous and more accurate comparable properties than the Pape report; and avoided other errors and inconsistencies when adjusting the values of those comparable properties. While we find the Pape report, to be burdened by multiple errors and inconsistencies, we find no reason to question the credibility of Mr. Jones or the reliability of the Jones report. Accordingly, we conclude that the Jones report provided an accurate valuation of the easement on Sherwood Farm and, therefore, that the value of the easement for purposes of a charitable contribution deduction is $7,350,000.

[*123] On its 2005 Form 1065, SWF reported a charitable contribution of $7,398,333 for its donation of the easement to Albemarle County PRFA, on the basis of a valuation prepared by Mr. Williams. Mr. Williams did not testify at trial, and petitioner relies only on the Jones report for the proper valuation of the easement. Consequently, we conclude that SWF overstated its charitable contribution deduction for its 2005 tax year by $48,333.

## VI. Conclusion

In summary, we hold that (1) SWF engaged in a disguised sale under section 707, (2) the proceeds from the disguised sale were income to SWF for its 2005 tax year, and (3) SWF overstated the value of the easement on Sherwood Farm by $48,333 and therefore overstated its charitable contribution deduction pursuant to section 170 for its 2005 tax year by the same amount. Consequently, we sustain the FPAA's proposed increase in ordinary income and a corresponding decrease in capital contributions of $1,677,413,[69] but we readjust the FPAA's proposed decrease in noncash charitable contributions to $48,333.

---

[69]As stated supra note 37, we deem conceded respondent's argument that SWF should have recognized $1,802,000 instead of the $1,677,413 reported in the FPAA.

**[*124]** In reaching these holdings, we have considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>An appropriate order will be issued, and decision will be entered under Rule 155</u>.